# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JUAN SANCHEZ,
Defendant and Appellant.

S087569

Tulare County Superior Court
40863

April 29, 2019

Justice Chin authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. SANCHEZ

S087569

Opinion of the Court by Chin, J.

After two juries were unable to reach a verdict, a third jury convicted defendant, Juan Sanchez, of the first degree murders of Ermanda Reyes and Lorena Martinez under the special circumstances of multiple murder and, as to Lorena Martinez, rape by instrument. It also found true that defendant personally used a firearm during the commission of both murders. After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict and imposed a judgment of death. This appeal is automatic. We affirm the judgment.

## I. THE FACTS

### A. Guilt Phase

#### 1. Overview

The evidence supported a jury finding that early in the morning of August 4, 1997, defendant entered the Porterville home of Ermanda Reyes (Ermanda) and her 17-year-old daughter, Lorena Martinez (Lorena), sexually assaulted Lorena, then shot and killed both mother and daughter. (All future dates in this factual recitation are to the year 1997 unless otherwise indicated.)

Defendant presented evidence trying to raise a reasonable doubt that he committed the crimes.

1

### 2. *Prosecution Evidence*

In early August, Ermanda lived on North Wellington Street in Porterville with her daughter, Lorena, her 13-year-old son, Victor M. (Victor), and her five-year-old son, Oscar H. (Oscar). Rosa Chandi, the sister of Ermanda's former husband, Efrain M. (Lorena's and Victor's father), lived with several family members nearby on North Wellington. Victor spent the night of Sunday to Monday, August 3-4, at his father's house, but Ermanda, Lorena, and Oscar were home that night.

Chandi woke early on the morning of Monday, August 4. A short time later, she observed Oscar approach her house alone. Oscar told her that his mother and Lorena were "sleeping," were "bleeding" and "cut," and he could not wake them. Chandi went with Oscar to the Reyes home. The front door was open, and Chandi entered with Oscar. Inside, she saw Ermanda's and Lorena's bodies in their respective bedrooms. She returned to her home and dialed 911. Officer Larry Rodriguez was the first to respond, arriving around 5:48 a.m. He entered the house and observed the bodies. Other responders soon arrived.

Lorena's body was in her bedroom lying partially on the bed and partially on the floor. She was wearing a bloody T-shirt that had been pulled up over her stomach area and a bra that had been pulled up enough to expose one breast. The bra had a one-inch cut that a knife might have made. Bloodstained underpants were around Lorena's knees. A separate piece torn from the underpants was on the floor nearby. A black-handled, silver-bladed steak knife was found on the bed under Lorena's body.

Blood was found in various places in the house, including a trail leading from outside Lorena's bedroom into the master bedroom, where Ermanda's body was located. Ermanda's body was lying on the floor next to the bed. A telephone was on a nightstand near the bed, but the handset to the telephone was on the floor. The physical evidence indicated that Lorena had been shot in her bedroom, and Ermanda had been shot outside Lorena's bedroom, then managed to return to her bedroom, where she died.

Lorena died of wounds to the chest from two gunshots. Fresh bruising and scratching in her genital and anal areas indicated she had been sexually assaulted by an instrument of some kind. Ermanda bled to death from a gunshot wound through the chest. She could have engaged in physical activity briefly before she died.

Investigators found three bullets, one in Lorena's mattress, one in her clothes, and one in the family room that had passed through her bedroom wall. They also found two unexpended cartridges in her bedroom. All came from the same gun, "[m]ore than likely" a nine-millimeter Luger semiautomatic handgun.

Detective Ty Lewis was dispatched to the crime scene at 5:45 a.m. that morning. When he arrived, he entered the Reyes home briefly, then went to the Chandi residence, where he spoke individually with Chandi and others. Chandi told him about a "boyfriend" she had seen recently at the Reyes house who might have committed the crime. She did not know his name, but she described him and said he drove a yellow truck. Detective Lewis spoke briefly with Oscar, who seemed "very calm." Oscar told him that "he had been sleeping in his mother's bedroom on the

floor and that he awoke to a man's loud voice, and there was a man standing in the bedroom." At that point, Oscar became nonresponsive, and Detective Lewis ended the interview.

Sergeant Chris Dempsie spoke with Oscar alone around 7:00 a.m. that morning at the Chandi house. During the interview, Oscar was emotional. "Periodically, he would stop crying and answer questions, but he was crying when he first came to me, and I believe he was crying towards the end of the interview also." Oscar told Sergeant Dempsie that he had been sleeping in his mother's bed and was "awakened by firecrackers." He "saw his mother coming towards the telephone that was next to his bed, and he also saw a man in the room with her." His mother was bleeding. She grabbed the telephone, then fell backwards. Oscar said that the man had a "wisp on his chin"; when he said that, Oscar brushed his chin with his hand. Oscar also said he was the man who "had brought him ice cream." Oscar said he tried to wake his mother but could not. He also saw blood on the walls and saw his sister and heard her screaming. She was bleeding. Then he ran outside to his aunt's house.

After speaking with Oscar, Sergeant Dempsie spoke with Victor, who had come to the Chandi house when he heard what had happened. He asked if Victor knew of someone who had brought Oscar ice cream. Victor testified that until that point, he was unaware defendant might have been involved in the crime. But he remembered that the previous Saturday, August 2, Oscar was eating ice cream at home. Defendant was present. Victor testified that Oscar told him at the time that "Juan" had gotten him the ice cream. Later in his testimony, Victor clarified that he had remembered the name "Juan" from seeing defendant at the Reyes house that weekend. Oscar did not use

the name at the time. Thus, Victor told the police that "Juan" had given Oscar the ice cream. Victor was also able to tell the police where defendant lived because Victor's family had once lived near him.

Later that morning, Sergeant Eric Kroutil obtained a photograph of defendant and showed it to Oscar. In the photograph, defendant had a mustache but no goatee. Oscar said the photograph was of "Juan," and he was the man he had seen in the house earlier that morning. At the time, Sergeant Kroutil was aware that Victor, not Oscar, had first used the name "Juan."

Defendant was arrested in his home in Porterville around 11:00 to 11:20 a.m. the same morning. After defendant's arrest, Sergeant Dempsie showed Oscar a photographic lineup containing a photograph of defendant taken that day. In this photograph, defendant had both a mustache and a goatee. Oscar identified defendant's photograph as that of Juan, the man who had given him ice cream and was in the house the morning of the murders. The interview was videotaped, and the videotape was played to the jury. During the interview, in addition to identifying defendant's photograph, Oscar added new details about what had occurred in the house that morning. He said that he hit Juan in the stomach; that Juan had a knife and a gun in his hand; that two men were in the room, one named Juan and one named Michael; and that Juan left the house in his yellow truck.

The same morning, Detective Steve Ward obtained a warrant to search defendant's home. He seized a steak knife with a black handle that he observed on a kitchen counter. He looked for, but could not find, a similar knife. Mary Lucio,

defendant's wife, testified that she had bought that knife and a similar but smaller knife at a "99-cent store" the previous February. She could not remember what happened to the second knife. She said she told police it probably got lost or was thrown away in the trash. After his arrest, defendant wrote a letter to Mary in Spanish telling her "to remember the knife that you had lost cutting cantaloupe." After receiving the letter, she told police that she lost the knife cutting cantaloupe. But at trial, she testified that she did not know what had happened to it.

A forensic metallurgist testified that he compared the knife found in Lorena's bedroom with the knife seized from defendant's house. He said that certain "design characteristics of the items suggest [a] common manufacturer," but he could not be certain.

Sergeant Kroutil interviewed defendant in English for about 30 to 40 minutes the afternoon of his arrest. Defendant "appeared concerned for his friends, cooperative . . . like he was wanting to help." After defendant was given and waived his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), he said he had known Ermanda but had not seen her for about two years until the previous Saturday, August 2. On that Saturday, he went to her home and drank beer with her for about three hours. He also bought ice cream for Oscar. The evening of Sunday, August 3, he spent some time at the home of Hector Hernandez, then returned to his home, where he spent the night. Lucio woke him that morning around 8:00 a.m., and he stayed in bed until 8:45 a.m.

When Sergeant Kroutil showed defendant a picture of the knife found in his home, he strongly denied it was his, saying,

"I've never seen a knife that looks like this." Then, when he realized the picture had been taken in his own home, he said, "[Y]eah, . . . my wife bought that at the 99-cent store." When asked whether she had bought another knife at the same time, he said, as Sergeant Kroutil testified, "[N]o, absolutely not, that was the only knife she bought."

Later the same day, Sergeant Kroutil spoke with defendant again briefly, mainly to obtain his consent to an interview the next day in Visalia. Other than standard booking procedures, no one else interviewed defendant that day. The next day, August 5, Sergeant Kroutil transported defendant to Visalia, where Visalia Police Detective Steve Shear interviewed him. The interview was tape recorded.

Detective Shear's interview with defendant began in English, then defendant requested and obtained a Spanish interpreter. Detective Shear testified, however, that he could understand defendant's English and defendant appeared to understand his English. Detective Shear told defendant about his *Miranda* rights, including that he had a right to an attorney. Defendant did not request an attorney. Defendant again denied committing the crime. When Detective Shear showed him a photograph of the knife found in his home, he said that his wife had purchased it at a 99-cent store. When Detective Shear showed him a photograph of the smaller knife found at the crime scene, defendant said he was not sure it was his. Later he said he remembered that the smaller "knife had been inadvertently left in the back yard when he and his wife had been cutting watermelon . . . about a week earlier." Defendant also reiterated that he had bought Oscar ice cream the previous Saturday.

After the interview with Detective Shear on August 5, defendant told Sergeant Kroutil that a "smaller version" of the knife found in his house had been "lost in his back yard and [he] was wanting somebody to go check or something like that."

Defendant spoke with police for a total of less than one hour on August 4 and less than two hours on August 5.

The next day, August 6, Detective Ward spoke with defendant for about 30 minutes. After that interview, Sergeant Ernie Garay, who speaks Spanish, interviewed defendant. Defendant had just eaten lunch. The interview between Garay and defendant was mostly in Spanish but some of it was in English, which defendant understood. An interview that was not recorded began at 12:30 p.m. and continued until they took a break at 1:55 p.m. Defendant was given and waived his *Miranda* rights. At first, defendant again denied committing the crime. But about 20 to 30 minutes into the interview, he said, "I'm screwed," and, as Sergeant Garay described it, "admitted going over to the house and shooting both of the victims." After telling Sergeant Garay in the unrecorded interview what he had done, defendant agreed to give a videotaped statement, which began at 2:20 p.m., in which he reiterated his confession. The videotape was played to the jury.

In the videotaped statement, after again receiving and waiving his *Miranda* rights, defendant said the following: He entered the Reyes house through an unlocked door. (One witness testified that the Reyes house was often unlocked.) He had a gun, but no knife. He was looking for Ermanda, who owed him money and had insulted him. When he saw Ermanda, he "just shot" two or three times. He also shot the other woman about two times. He did not know if he hit them. He did not

8

know why he shot, saying, "I was blacked out." But he also said he saw a knife in Lorena's hand and thought "she was going to kill me." He did not see anyone else in the house and did not follow anyone into the other room. He denied sexually assaulting Lorena, stating, "I didn't touch her." He was inside for only about five minutes. He then left the house and drove away in his truck. While driving, he threw the gun into a field. He thought the gun was a ".22" but added, "I don't know guns." (The police looked for the gun where defendant said he had thrown it but could not find it.)

By the time of the third trial, more than two years after the crime, Oscar testified that he remembered little about the events of August 4. He did remember that defendant had brought him ice cream, although he could not remember when. He also remembered talking to the police on August 4, when everything was fresh in his mind; he testified that he told them the truth. At one point on redirect examination, Oscar did identify defendant as a man he saw the day his mother was killed. But then he promptly reiterated that he did not remember. On recross-examination by defense counsel, he also identified a photograph of a different person as someone else he saw at his mother's house the night she died.

Hector Hernandez testified that defendant came to his house twice during the evening of Sunday, August 3, using his yellow truck. Hernandez asked defendant to give him a ride to work the next morning, as he often did. Defendant agreed to give him a ride, and Hernandez gave him ten dollars to pay for it. The next morning, August 4, Hernandez woke at 5:00 a.m., as he had to be at work by 6:30 a.m. Defendant was supposed to come to his home around 6:00 a.m. Hernandez called his brother for a ride just after 5:30 a.m. because he feared

defendant would not come. His brother then gave him a ride to work. Hernandez testified that defendant did not come to his house that morning, or at least that he did not see him.

Margarita Ruiz testified that soon after the murders, Hernandez told her that defendant had been at his house around 5:00 a.m. on August 4. Hernandez denied telling her this. Hernandez's brother testified that Hernandez called him to give him a ride to work around 5:00 to 5:10 a.m. that morning. Hernandez had not called him the night before.

Hernandez later testified that he had had a sexual relationship with defendant for about five years, and he loved him. He said, however, that he would not lie for defendant and insisted that defendant did not come to his house early on August 4.

Lucio testified that on August 4, she went to bed for the last time around 4:30 a.m. Defendant was in her bed at the time. She awoke around 6:30 to 7:00 a.m. Defendant was in her bed at that time also. However, Lucio told police that defendant "might have been acting like he was asleep" when she went to bed at 4:30 a.m., that she was sleeping "very soundly" that morning, that it was "absolutely" possible for defendant to leave her bed and return without disturbing her, and that he had done so "hundreds of times" or "a thousand times" in the past. At trial, Lucio denied that defendant could have left without her knowing it. After the killings, Lucio told a friend that the morning of August 4, defendant was withdrawn and acting strange. He wanted to put his truck in the backyard.

Several witnesses, including Chandi, testified that they saw defendant or his distinctive yellow truck, or both, at or around the Reyes residence on multiple occasions the weekend

before the crimes. One witness testified that she observed defendant drive the truck by the residence "real slow" more than once. Around 1:30 a.m. on the morning of August 4, when she went outside to smoke, the same witness saw defendant talking with Ermanda in her garage. Ermanda appeared agitated. Another witness testified she saw defendant there three times within a short period of time. Once she saw defendant and Ermanda speaking loudly in front of her house. Defendant was gesturing with his hands. Another witness testified that she saw defendant with Ermanda the Saturday before the killings. Defendant left in his truck appearing upset.

Michael Stephens, Lucio's nephew, who was at defendant's home early on the morning of August 4, testified that he might have heard what he believed was defendant's noisy truck early that morning, but he was not sure. Previously, Stephens had told police unequivocally that he did hear the truck start up early that morning.

Lucio testified that defendant once told her that he wanted to bring a firearm home, although she did not see any guns at home. Alonzo Perez, Hernandez's cousin, testified that he drove to a dump with defendant in defendant's yellow truck the day before the murders. Defendant told him that "he had a gun at home." Camarino Reyes, Ermanda's brother, testified that before Ermanda's funeral, Raul Madrid, Ermanda's brother-in-law, told him that the week before Ermanda was killed, Madrid gave defendant a ride home. On his way back, Madrid realized that defendant had left a nine-millimeter gun in his pickup. Madrid said he returned the gun the next day. After Madrid said this, he said no more and reacted as if "he had blown it." At trial, Madrid denied the conversation. Catherine Barrera

testified that defendant stayed with her for a while during the summer of 1997. He told her he had a gun.

The distance by car from the Reyes house to Hernandez's home was 1.4 miles, and it took about two minutes 40 seconds to drive it. The distance from defendant's home to the Reyes house was 1.5 miles, and it took about three minutes ten seconds to drive it. The distance from defendant's house to Hernandez's home was 1.6 miles, and it took about two minutes 35 seconds to drive it.

The prosecution also presented evidence that was exculpatory. Defendant's DNA was not found anywhere in the Reyes house. His fingerprints were found on some beer cans but not elsewhere in the house. A bloody shoeprint was found in the house. The boots defendant wore when he was arrested did not match the shoeprint, nor did police find any matching shoes in defendant's house. None of defendant's clothes were bloodstained. Neither semen nor sperm were found in or around Lorena's body.

When police arrived at the crime scene, the window of Victor's bedroom was open. The window screen was removed and leaning against the wall outside. But the window ledge on the inside was dusty and showed no signs of a recent disturbance. The knife found at the crime scene had one partial and two full fingerprints that were unidentified but were not defendant's or Lucio's. The sliding portion of the open window of Victor's bedroom contained unidentified fingerprints that were not defendant's. Because of similarities between the prints on the window and the prints on the knife, there was a "strong possibility" they came from the same person. But because of the nature and condition of the prints, the fingerprint examiner

could not say for sure. The examiner could not say how long the prints had been there.

### 3. *Defense Evidence*

Defendant presented evidence relevant to Oscar's credibility at trial and the credibility of Oscar's statements and identifications the day of the crimes. This evidence included events that might have influenced him, primarily conversations inside the Chandi house the morning of the crimes; Oscar's inconsistent statements, including some of his prior testimony; testimony from Wanda Newton, a professional counselor who provided therapy to Oscar; and testimony from Dr. Susan Streeter, a psychologist and expert on the reliability of child witnesses. He also presented evidence of his actions the day before the crimes, evidence inconsistent with some of the prosecution evidence, and evidence from persons who knew Ermanda and Lorena well that they never saw defendant at Ermanda's home.

Defendant testified. He denied committing the crimes. He said he visited Ermanda the Saturday before the crimes and again the next day. He had never been to the house previously, although he had known Ermanda from a time in the past when she lived near him. On that Saturday, he brought a six-pack of beer and, for Oscar, ice cream. On Sunday evening, August 3, he went to Hernandez's home for a while, then returned home, where he eventually went to bed. He awoke the next morning, August 4, around 9:30-9:45 a.m. He was surprised to be arrested later that morning.

Defendant said he had not agreed to give Hernandez a ride to work the morning of August 4. He also denied telling Alonzo Perez and Catherine Barrera that he had a gun.

Defendant testified about his interviews with police on August 4, 5, and 6, leading to what he said was a false confession. He denied that Sergeant Kroutil gave him his *Miranda* rights. He said he asked Sergeant Kroutil, Detective Shear, and Sergeant Garay for an attorney on multiple occasions, although never when the interview was being recorded. He said the officers ignored his requests, except that Detective Shear told him he did not need an attorney.

Defendant testified that Detective Ward threatened to put him in a cell with a "crazy man . . . so he can kill you." The detective also said, "I better tell him, and if not, then he, himself, would inject me so that he could see me die, suffering, dying, little by little for what I had done." Sergeant Garay threatened to take his family away "if I didn't tell him." Defendant confessed "after they had me all scared and pressured. I told them so they could leave me at peace." He also confessed "because of Ward's threat, because Garay had already said to me that he was going to take my family away, because I was tired and so that I could satisfy them. I said it so they would leave me at peace, alone. This was three days with the chains. I was three days with the chains and all I wanted was to be left alone or at peace." (Both Sergeant Garay and Detective Ward denied making these, or any, threats.)

Defendant also presented the testimony of Dr. Richard Ofshe, a social psychologist, regarding, as defendant states it on appeal, "how the misuse of police interrogation tactics, including threats and coercion, can result in false confessions."[1]

---

[1] On rebuttal, the prosecution presented the expert testimony of Joseph Buckley regarding police interrogations and confessions.

## B. Penalty Phase

The prosecution presented evidence of defendant's crimes of violence against his wife, Mary Lucio, and his stepdaughter, Tammy Lucio. It also presented the testimony of Rosa Chandi, Michelle Chandi (Lorena's cousin), and Victor about the impact the murders had on them.

Defendant presented a substantial case in mitigation. Thirteen friends and relatives who knew him well, including his wife, son and stepchildren, testified about his difficult upbringing, his good qualities, and their continuing love for him.

Dr. Jose La Calle, a clinical psychologist, testified that his testing showed that defendant had an intelligence quotient (IQ) of 84, "the lowest end of the dull normal intelligent level." Defendant's "Spanish vocabulary was probably around third or fourth elementary grade level." He attended elementary school sporadically for about three years. Someone with defendant's IQ could "do some problem solving in mechanics," but defendant's abstract problem solving was "very poor." He had poor short-term attention span. He also had a "short fuse," meaning a "low tolerance threshold to a stress." But "short fuse" does not mean "violent reaction" or "blowing your top."

Mike Harvey, a Tulare County deputy sheriff, testified that defendant had had no "write-ups or disciplinary actions" while in jail.

## II. DISCUSSION

### A. Issues Regarding Guilt

#### 1. Contentions Regarding Oscar's Testimony and Statements the Day of the Crimes

Defendant makes several arguments regarding Oscar's testimony and the evidence of his statements and photographic identifications the day of the crimes.

To place the arguments into context, it is important to keep in mind the following: By the time Oscar testified, more than two years after the events, he had little memory of what happened the morning of August 4, 1997. His trial testimony, as distinguished from his statements on August 4, included little that implicated defendant in the crimes. In his argument to the jury, the prosecutor did not rely on Oscar's testimony at all, but only on the evidence of his statement to police that the man he saw in the bedroom that morning was the one who had brought him ice cream, and his two photographic identifications of defendant as that man. What the jury had to decide was the credibility of that statement and those identifications.

#### a. Oscar's Competence To Testify

Defendant contends the court erred in finding Oscar competent to testify.

"Except as otherwise provided by statute, every person, *irrespective of age*, is qualified to be a witness and no person is disqualified to testify to any matter." (Evid. Code, § 700, italics added.) "A person is disqualified to be a witness if he or she is: [¶] (1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or [¶] (2) Incapable of understanding the duty of a witness to tell the

truth." (Evid. Code, § 701, subd. (a).) The grounds stated in Evidence Code section 701, subdivision (a)(1) and (2), are the "*only*" grounds for disqualifying a witness from testifying. (*People v. Anderson* (2001) 25 Cal.4th 543, 572.)

Defendant does not contend that Oscar was incapable of expressing himself so as to be understood. A quick review of the transcript of his testimony shows he was quite capable of expressing himself. But defendant contends the court should have declared him disqualified because he was incapable of understanding his duty to tell the truth.

"Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion." (*People v. Anderson*, *supra*, 25 Cal.4th at p. 573.) "[T]he *credibility* of a witness is an issue for the jury, and not a relevant factor in determining competence to testify." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1264, fn. 16; see *People v. Avila* (2006) 38 Cal.4th 491, 589-590.)

The trial court acted well within its discretion in permitting Oscar to testify. Defendant moved to disqualify Oscar before the first trial. The court presided over a lengthy evidentiary hearing, during which Oscar, as well as others, including Dr. Streeter and Wanda Newton, testified. After the hearing, the court found him competent to testify in a written ruling: "The court observed the minor testify on the issue and has considered his demeanor and responses as well as the other evidence presented. The court finds the minor witness is capable of expressing himself concerning the matter so as to be

understood and the minor understands his duty to tell the truth. As to defense contentions of inconsistencies and concerns relating to the minor's therapy, these are matters for the trier of fact to consider on the issue of credibility and are not a basis to disqualify a witness from testifying. (See *People v. Dennis* (1998) 17 Cal.4th 468.)"

At the original hearing, Oscar testified that he was seven years old and in the first grade. At first, he said he did not know the difference between the truth and a lie. But when questioned carefully, he made clear he did understand the difference. The prosecutor held what Oscar knew was a pen. When the prosecutor said, "If I told you this is a car," Oscar responded, "That would be a lie." When asked whether he would lie or tell the truth while sitting in the witness chair, he responded, "The truth." He said he understood it was important for him to tell the truth, and he would always tell the truth while sitting in the chair. Defense counsel's cross-examination and the redirect examination reinforced that Oscar was able to understand his duty to tell the truth.

Similarly, at the trial under review, Oscar made clear he understood his duty to tell the truth. At the beginning of his testimony, he said he would tell the truth. The prosecutor asked, "If I said I was wearing a blue shirt, would that be the truth or would that be a lie?" Oscar responded, "A lie." The prosecutor then asked, "If I said I was wearing a tie with elephants on it, would that be the truth or would that be a lie?" Oscar responded, "The truth." The record before us does not reveal the appearance of the prosecutor's shirt or tie, but presumably Oscar responded appropriately. No one suggested otherwise. After this testimony, the court again found Oscar competent to testify.

Oscar's testimony supports the trial court's finding. (*People v. Dennis, supra,* 17 Cal.4th at p. 525 [voir dire testimony of a child four years old at the time of the crimes and eight years old when testifying established that she "understood the difference between truth and falsehood and appreciated that she had to tell the truth"].) Defendant argues that Oscar had made many inconsistent statements between the time of the crimes and his testimony; that his memory had been corrupted by, among other things, the fact he had undergone therapy; and that he was incredible. Some of these arguments are factually supported; all are irrelevant to Oscar's competence to testify but instead were matters for the jury to consider.

Oscar was seven or eight years old when he testified at the third trial. Children much younger have been found competent to testify. (*People v. Lopez* (2018) 5 Cal.5th 339, 351 [two child witnesses, one six and a half years old, and the other not quite five years old at the time of trial]; *People v. Mincey* (1992) 2 Cal.4th 408, 443 [five years old at the time of trial]; *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 941 [five years two months old at the time of trial]; see *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1368-1369 [collecting cases in which four- and five-year-old children were found competent to testify].)

Regarding a five-year-old witness, we explained that "[i]nconsistencies in testimony and a failure to remember aspects of the subject of the testimony, however, do not disqualify a witness. [Citation.] They present questions of credibility for resolution by the trier of fact." (*People v. Mincey, supra,* 2 Cal.4th at p. 444.) Similarly, we can easily adapt to this case our discussion in a case involving an eight-year-old witness: "The facts that [Oscar] received therapy to help [him] cope with [his] mother's [and, here, sister's] death, that [he]

discussed the events with the prosecutor and others, and that [he] had gaps in [his] memories of the [morning] the crimes occurred, do not disqualify [him] as a witness." (*People v. Dennis, supra,* 17 Cal.4th at p. 526.)

In the *Giron-Chamul* case, the defendant argued the five-year-old child was disqualified because her testimony was " 'fantastical.' " (*People v. Giron-Chamul, supra,* 245 Cal.App.4th at p. 958.) The court disagreed for reasons that apply here. It explained that the witness was "a child, and children have imaginations. '[T]he fact that a very young witness makes inconsistent or exaggerated statements does not indicate an inability to perceive, recollect, and communicate or an inability to understand the duty to tell the truth,' even if some parts of the child's testimony may be 'inherently incredible.' " (*Id.* at p. 960.)

In short, we see no abuse of discretion in the trial court's finding Oscar competent to testify and letting the jury determine his credibility.

### b. *Asserted Error in Admitting Oscar's "Unreliable" Statements and Testimony*

In a similar vein, defendant argues that Oscar's testimony and earlier statements were too unreliable to be admitted. But, as explained in part II.A.1.a, *ante,* these are arguments for the jury to consider, not grounds to exclude the evidence. Defendant also argues Oscar did not have "personal knowledge of the matter" about which he testified. (Evid. Code, § 702, subd. (a).) The comments of the Law Revision Commission to Evidence Code section 701 explain, "Because a witness, qualified under Section 701, must have personal knowledge of the facts to which he testifies (Section 702), he must, of course, have the capacity

to perceive and to recollect those facts. But the court may exclude the testimony of a witness for lack of personal knowledge only if no jury could reasonably find that he has such knowledge. [Citation.] Thus, the Evidence Code has made a person's capacity to perceive and to recollect a condition for the admission of his testimony concerning a particular matter instead of a condition for his competency to be a witness. And, under the Evidence Code, if there is evidence that the witness has those capacities, the determination whether he in fact perceived and does recollect is left to the trier of fact." (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 701, p. 284; see *People v. Dennis*, *supra*, 17 Cal.4th at pp. 525-526 [quoting the same comment], *People v. Lopez*, *supra*, 5 Cal.5th at p. 351.)

The trial court did not abuse its discretion in admitting the evidence. (*People v. Lopez*, *supra*, 5 Cal.5th at p. 352.) Oscar was present at the events about which he testified. At trial, he could not remember much, but the jury was entitled to consider and evaluate what he did remember. (*People v. Dennis*, *supra*, 17 Cal.4th at pp. 491-492 [trial court properly admitted the testimony of a child who "did not remember much about the traumatic attack on her mother"].) Oscar's testimony "showed that [he] could perceive and recollect, and [he] understood [he] should not invent or lie about anything [he] said in court. [He] was an eyewitness to the events. Consequently, once the trial court properly determined [he] was competent to testify under Evidence Code section 701, it had no basis for excluding [his] testimony for lack of personal knowledge." (*Id*. at p. 526.)

In fact, Oscar's trial testimony was, by and large, quite credible. He said he remembered little about the events of August 4, 1997. The trial court specifically credited this part of

his testimony. Oscar's lack of current memory was, indeed, consistent with defendant's own evidence suggesting that later events, such as therapy, might have corrupted his memory. From the prosecutor's perspective, probably his most important testimony was that he told the police the truth the morning of the crimes. The jury could readily find this testimony credible. The jury could also find it credible that, although Oscar could not remember what he told police, he did remember that, whatever it was, it was the truth. Oscar also testified that defendant had brought him ice cream, although he could not remember when. This testimony was highly credible. That a person brought him ice cream is something a five-year-old child would likely remember. Moreover, defendant himself said that he brought Oscar ice cream in his first interview with Sergeant Kroutil and again at trial.

The trial court properly permitted the jury to consider Oscar's testimony and the evidence of his statements the morning of the crimes and to judge for itself their reliability. Contrary to defendant's argument, doing so did not violate his due process rights. (*People v. Lopez, supra*, 5 Cal.5th at pp. 353-354.)

### c. Admissibility of Oscar's Photographic Identifications

Defendant contends the procedures by which Oscar made the two photographic identifications was impermissibly suggestive and, to the extent Oscar identified defendant at trial, that identification was tainted by the earlier improper identifications.

### *i. Factual Background*

Sergeants Dempsie and Kroutil testified about the identifications at an evidentiary hearing held before the first trial. Sergeant Dempsie spoke with Oscar at Rosa Chandi's home early the morning of August 4, 1997. Oscar told him the man he saw in the bedroom had brought him ice cream and had a "wisp on his chin." When Oscar said that he gestured by rubbing his chin. Oscar gave no name. After speaking with Oscar, Sergeant Dempsie spoke with Victor and obtained information regarding defendant that he provided to Sergeant Kroutil.

Using information that Sergeant Dempsie provided, Sergeant Kroutil obtained a past booking photograph of defendant. In the photograph, defendant had a mustache but no goatee. Around 9:00 a.m. that morning, he showed the photograph to Oscar while they were alone in a bedroom in the Chandi residence. Sergeant Kroutil told Oscar something along the lines of "I wanted to show him a photograph and see if he knew the person in it." Oscar said it was "Juan," the man he had seen "that morning while his mom was bleeding." From information that Sergeant Dempsie had provided, Sergeant Kroutil understood that Oscar had originally not provided a name, but in the interim he had gotten the name from Victor. Oscar "was very strong in his belief that it was Juan."

Later that morning, Sergeant Dempsie showed Oscar a photographic lineup containing six photographs, one of which was of defendant taken that morning. In that photograph, defendant had both a mustache and a goatee, as did the others in the lineup. Oscar identified defendant's photograph.

Originally, the court ruled evidence of the single-photograph showup admissible but not evidence of the photographic lineup. At the trial under review, however, the court ruled the evidence of the photographic lineup was also admissible. Accordingly, the jury heard evidence of both of Oscar's photographic identifications.[2]

### ii. Analysis

Defendant contends the identification procedure was impermissibly suggestive in violation of his due process rights.

"A due process violation occurs only if the identification procedure is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " (*People v. Cook* (2007) 40 Cal.4th 1334, 1355, quoting *Simmons v. United States* (1968) 390 U.S. 377, 384.) "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification."

---

[2] Two days after the photographic identifications, Oscar also identified defendant from a live lineup. But the trial court found that lineup impermissibly suggestive because defendant was the only person wearing striped jail pants. Accordingly, evidence of that lineup was not admitted at any of the trials.

(*People v. Cunningham* (2001) 25 Cal.4th 926, 989; see *People v. Clark* (2016) 63 Cal.4th 522, 556-558.)  "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." (*Manson v. Brathwaite* (1977) 432 U.S. 98, 114.)

Because there is no dispute regarding the historical facts, we independently review the trial court's ruling that the identification was admissible.  (*People v. Kennedy* (2005) 36 Cal.4th 595, 609.)

Defendant first contends that Sergeant Kroutil's showing Oscar a single photograph was both unnecessary and impermissibly suggestive.  We have said that such showups are not necessarily unfair.  (*People v. Clark* (1992) 3 Cal.4th 41, 136.)  "Rather, all the circumstances must be considered." (*Ibid*.)  Nevertheless, a single-photograph showup is inherently suggestive, at least to some extent.  (*Manson v. Brathwaite*, *supra*, 432 U.S. at p. 109.)  It is unclear whether the showup was necessary in this case.  At the time Oscar viewed the single photograph, defendant was a suspect but was still at large.  To take the time to prepare a photographic spread may have increased the risk that he might flee.  On the other hand, Oscar had already identified the killer as the man who brought him ice cream, and Victor had already identified defendant as the man who brought Oscar ice cream.  That may have been reason enough to arrest (or at least monitor) defendant without conducting a photo identification beforehand.  The police also put together a photo array mere hours after the showup — and perhaps could have done so much faster given that they arrested (and processed) Sanchez in the meantime.  Plus, unlike the witness in *Stovall v. Denno* (1967) 388 U.S. 293, Oscar was not himself on the brink of death.  The issue is therefore close.

But we need not decide whether the procedure was necessary. Although the reliability of Oscar's showup identification itself presents a difficult issue, we ultimately find that it was reliable under the totality of the circumstances. The inherent suggestiveness of the procedure was outweighed by other factors confirming the reliability of the identification. (See *Manson v. Brathwaite, supra*, 432 U.S. at p. 116.) Sergeant Kroutil merely showed Oscar a photograph and asked if he knew the person. That did not explicitly suggest the answer. Moreover, although Oscar had indicated (correctly) that the man who gave him ice cream had a goatee, the photograph was from a time in the past when defendant did not have a goatee. Thus, defendant's appearance in the photograph was different than his appearance the day of the shooting and different than Oscar's description of the man he observed. If anything, the difference in facial hair suggested the photograph was *not* of the man Oscar had observed. So although Oscar — unlike the witness in *Braithwaite* — was not an adult "trained police officer" viewing a showup "at his leisure," and "[a]lthough identifications arising from single-photograph displays may be viewed in general with suspicion," we still see relatively "little pressure on [Oscar] to acquiesce in the suggestion that such a display entails." (*Id.* at pp. 115-116)

Against this possible corrupting effect, we weigh the factors indicating the identification was reliable. For a start, the showup occurred mere hours after the murders. And although Oscar probably had only a fleeting opportunity to observe the man in the dimly lit bedroom at the time of the offense, he had ample opportunity to observe and get to know defendant the weekend before the Monday morning murders. It likely would not take Oscar long in the bedroom that morning to recognize

the man he saw as the man he had seen much of over the weekend and who had brought him ice cream. His description of defendant, including the goatee, was accurate. Moreover, Oscar identified defendant even though the photograph he was shown did not contain that goatee, thus suggesting the identification was based on his observation rather than the photograph matching his description.

Other circumstances support a finding of reliability. Part of the identification was independently corroborated by none other than defendant himself. Oscar identified defendant in two respects: (1) as the man who brought him ice cream, and (2) as the man he saw in the bedroom. The first of these was later shown to be completely reliable. Defendant said the same thing in his initial interview with police and later at trial. Moreover, the physical evidence corroborated part of what Oscar told the police that morning. He said that his mother grabbed the telephone, then fell. Ermanda's body was lying on the floor, and the telephone handset was on the floor. The only disputed point was Oscar's statement that the man who brought him ice cream was also the man in the bedroom. But Oscar said that *before* he was shown the photograph. Thus, the showup could not have influenced that statement.

In short, although the suggestive nature of the identification does raise concerns, we find Oscar's identification of the single photograph as the man he saw in the bedroom sufficiently reliable to be admissible. Defendant did not carry his "burden of demonstrating the existence of an unreliable identification procedure." (*People v. Cunningham, supra*, 25 Cal.4th at p. 989.) We note, however, that because single-photograph showups are inherently suggestive, they should be

used very cautiously, and only when truly necessary. It is generally better to use a multiple-photograph lineup.

Defendant also challenges the photographic lineup. We have viewed it, and it was fair. Defendant's photograph in the lineup was different than the one Oscar had previously seen, so Oscar did not simply reidentify the same photograph. All of the photographs were of persons with both a goatee and a mustache. "The question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter* (1997) 15 Cal.4th 312, 367.) Nothing did in this lineup. Defendant argues that the conversation between Sergeant Dempsie and Oscar before the viewing impermissibly suggested Oscar's identification. "Our review of the transcripts reveals no such suggestiveness in [Dempsie's] inquiries." (*People v. Avila* (2009) 46 Cal.4th 680, 699.) Sergeant Dempsie asked Oscar questions about what he had seen and then asked him whether the man he had seen was among the pictures. He did not say that the man was in the lineup and did not suggest which, if any, of the six photographs Oscar should select.

Finally, defendant contends Oscar's trial testimony was tainted by the earlier identification procedures. At trial, Oscar identified defendant in only two respects. First, he said defendant had brought him ice cream, testimony that, as noted, was entirely reliable, having been corroborated by defendant himself. Second, although Oscar generally testified that he did not remember the events that morning, on redirect examination he did briefly identify defendant as the man he saw in the house. But then Oscar reiterated that he did not remember. To the extent this testimony can be considered a trial identification of defendant as the perpetrator, the jury could readily consider it,

by itself, to be unreliable. Similarly, the jury could readily consider as equally unreliable Oscar's additional testimony on recross-examination that the photograph of a different person was also of someone he had seen at the house when his mother died.

As was apparent to the jury, Oscar's memory was largely corrupted by the time he testified at the third trial. But the identification procedures the morning of the crimes did not cause this corruption. Instead, other factors that defendant himself identified at trial, including the passage of time, and external events such as Oscar's therapy, caused the corruption. The jury was entitled to consider Oscar's trial testimony for what it was worth.

### d. Admission of Oscar's Hearsay Statements Made on the Day of the Murders

Over defendant's hearsay objections, the court admitted evidence of Oscar's statements the morning of the shooting to Sergeant Dempsie (the man he saw in the bedroom had a "wisp on his chin" and had brought him ice cream) and Sergeant Kroutil (identifying a photograph of defendant as that man). In a written ruling before the first trial, reiterated at the trial under review, the court admitted the statement to Sergeant Dempsie as a spontaneous statement under Evidence Code section 1240. The court found that, "given the totality of the circumstances, Oscar provided the information about the man with a 'wisp' who gave him ice cream while Oscar was under the stress of excitement and while his reflective powers were still in abeyance."

The court admitted the statement to Sergeant Kroutil on three grounds: (1) as a spontaneous statement, (2) as a prior

consistent statement under Evidence Code sections 791 and 1236, and (3) as a past recollection recorded under Evidence Code section 1237. It noted that "the interview between Oscar and Kroutil occurred within three hours of probably the most stressful, shocking event I think any of us could perceive, anyone could experience, that is, the death of a five year old's mother and sister."

Defendant contends the court erred in admitting both statements. We disagree. We review the court's evidentiary rulings for abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) The court acted within its discretion in finding the statement to Sergeant Dempsie admissible as a spontaneous statement and in finding the statement to Sergeant Kroutil admissible as a past recollection recorded. Because one ground for admissibility is sufficient, we need not consider whether the statement to Sergeant Kroutil was also admissible on the other grounds the court cited. (See *Cowan*, at p. 465.)

"Evidence Code section 1240 provides that '[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement' '[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant' and '[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception.' '[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflexive faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief.' [Citation.] [¶] 'To be admissible, "(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the

utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstances of the occurrence preceding it." ' " (*People v. Lynch* (2010) 50 Cal.4th 693, 751-752.)

The first and third of these requirements are clearly met. What occurred, the deaths of his mother and sister, was certainly startling, and Oscar's statements related to the circumstances of that occurrence. Defendant contends the second requirement is not met because Oscar had time to contrive and misrepresent. "Because the second admissibility requirement, i.e., that the statement was made before there was ' "time to contrive and misrepresent," ' 'relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met.' " (*People v. Lynch, supra,* 50 Cal.4th at p. 752.)

"A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent.' [Citation.] Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication. [Citations.] This court has observed, however, that these factors 'may be important, but solely as an indicator of the mental state of the declarant.' [Citation.] For this reason,

no one factor or combination of factors is dispositive." (*People v. Merriman* (2014) 60 Cal.4th 1, 64.)

We see no abuse of discretion. When the court made its final ruling, it had presided over a detailed evidentiary ruling and two previous trials. It knew the facts thoroughly. The most important factor here was that, as the court noted, the underlying event was truly startling, especially for a five year old. The court could reasonably conclude it would take a long time for the child to regain his reflective powers after what he saw and experienced. Sergeant Dempsie spoke with Oscar within about an hour and a half of that event. He testified that during the interview, Oscar was emotional and was crying part of the time. Given the circumstances, Sergeant Dempsie's testimony was credible. The trial court could readily conclude that Oscar had not by then had time to contrive or misrepresent, or to reflect or fabricate.

As defendant notes, Detective Lewis testified that when he spoke with Oscar earlier that morning, Oscar seemed calm. However, Oscar also soon became nonresponsive in that interview. He could well have been in shock, then later reacted emotionally. The trial court could reasonably find that Oscar was under the stress of the earlier events on both occasions. Defendant also argues that Oscar might have heard discussion from others in the Chandi house suggesting defendant was the perpetrator. But there was no evidence that anyone suggested that the man who brought Oscar ice cream was the perpetrator. Oscar said that himself. In any event, whether or not there might have been discussion in the Chandi house, the court acted within its discretion when it found Oscar was still under the stress of the earlier events when he made the statement.

The court also acted within its discretion when it found the statement to Sergeant Kroutil admissible as a past recollection recorded. "Evidence Code section 1237 permits evidence of a witness's past statement 'if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) [w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2) [w]as made . . . (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3) [i]s offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) [i]s offered after the writing is authenticated as an accurate record of the statement.' (Evid. Code, § 1237, subd. (a).)" (*People v. Cowan*, *supra*, 50 Cal.4th at p. 465.)

At trial, Oscar certainly had "insufficient present recollection to enable him to testify fully and accurately" about the matter. (Evid. Code, § 1237, subd. (a).) Defendant contends instead that he had too little recollection at trial. Citing *People v. Simmons* (1981) 123 Cal.App.3d 677, he argues that the third requirement — that the witness testifies the statement was true — is lacking. In *Simmons*, after the witness had made the statement in question, he suffered a head injury causing amnesia. At trial, he could not remember making the statement or whether it was true. All he could say was that he had no reason not to tell the truth. The Court of Appeal held that was insufficient to satisfy the statutory requirements. As it noted, "the witness did not, and was unable to, attest to the accuracy

of the matters contained in his previous statement." (*Id.* at p. 682.)

This case is different than *People v. Simmons*, *supra*, 123 Cal.App.3d 677. Like the witness in *Simmons*, Oscar did not remember the statements. But, *unlike* the witness in *Simmons*, he testified that he remembered talking with the police and, critically, he remembered that he told them the truth.

In *People v. Cowan*, *supra*, 50 Cal.4th 401, the witness testified that he had told the truth regarding the statement in question "to the best of his ability," although he admitted that his memory had been " 'jumbled' and 'scrambled' because of" drug use. (*Id.* at p. 466.) We found this testimony sufficient to admit the prior statement. We explained that " 'whether an adequate foundation for admission' of a statement under Evidence Code section 1237 has been established turns on whether the declarant's 'testimony that [the] statement was true was reliable,' and the trial court who hears the declarant's testimony has 'the best opportunity' to assess its credibility." (*Id.* at p. 467.) We concluded that, "[u]nder the circumstances, we cannot say that the trial court abused its discretion in determining the statement was sufficiently reliable to be admitted under [Evidence Code] section 1237." (*Ibid.*)

Similarly, we find no abuse of discretion in finding Oscar's testimony that he told the truth sufficiently reliable to admit the evidence. That Oscar remembered telling the truth was quite credible even though he could not remember what he said. The court or jury could reasonably find that a child would normally tell the truth in that situation and could remember that he did so even though he remembered little else.

Defendant also argues that, because Oscar remembered little about the events when he testified, admitting the prior

statements violated his constitutional rights to confront and cross-examine witnesses. However, as the United States Supreme Court has stated, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford v. Washington* (2004) 541 U.S. 36, 59-60, fn. 9.) This is true even if the witness cannot recall the statement. "Defendant contends there can be no constitutionally effective cross-examination when the witness cannot recall the facts related in the hearsay statement. [Citations.] But the high court has squarely rejected that contention, concluding that 'when a hearsay declarant is present at trial and subject to unrestricted cross-examination,' 'the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness'[s] demeanor satisfy the constitutional requirements,' notwithstanding the witness's claimed memory loss about the facts related in the hearsay statement. (*United States v. Owens* (1988) 484 U.S. 554, 559-560.) Nothing in *Crawford* casts doubt on the continuing vitality of *Owens*." (*People v. Cowan, supra,* 50 Cal.4th at p. 468; see *People v. Rodriguez* (2014) 58 Cal.4th 587, 632-633 [similar].)

Defendant was permitted to cross-examine Oscar, and the jury could observe his demeanor. Importantly, defendant was also able to cross-examine other witnesses, present evidence about the circumstances under which Oscar made the statements, and present any other evidence relevant to the credibility of those statements. This was sufficient to satisfy defendant's confrontation rights.

### e. Restrictions on Defendant's Presentation of Evidence To Impeach Oscar's Credibility

Defendant sought to challenge Oscar's credibility by presenting evidence of his prior statements and some of his testimony at previous trials. The court admitted some of the statements and testimony but not all. Given Oscar's testimony that he could remember little of the events of August 4, 1997, which the court found not to be evasive, the court generally found that the statements it excluded were not inconsistent with his trial testimony and, additionally, were not admissible as past recollections recorded. Defendant contends the court erred by excluding those statements.

We need not review in detail the court's many rulings, because even if we assume the court erred under California law in excluding any or all of the proffered statements, the error was harmless and was not so severe as to violate defendant's federal constitutional right to confront the witnesses against him.

The court permitted defendant to admit the following statements over the prosecutor's hearsay objections. On cross-examination of Oscar, defense counsel elicited that in an earlier trial, he said, "[N]o" when asked whether the "person in the courtroom today [is] the person who came in," and he shook his head when asked if he saw the person "here today."

Defense counsel elicited testimony from prosecution witness Camarino Reyes that around August 10, 1997, Oscar told him "that he saw a big man."

Oscar's biological father, Jose H., testified that after August 20, 1997, he took Oscar to his home in Idaho. Oscar told Jose H. that his mother would come back for him and that she would talk to him. About two or three weeks after August 20,

1997, Oscar also told Jose H. that three men were in the house the night his mother died. Oscar gave his father three names of the men, only two of which the father remembered. Oscar gave the names of "Juan" and either "Marcos" or "Michael."

Lola Ortiz testified that a few days after the shooting, Oscar gave her the names of the persons he saw in the house the night his mother died. He said "Juan" was there, as well as a man who was Ermanda's mechanic and a friend of Lorena's called "Big Man." At one point, Oscar told Ortiz that "Domingo" had been there.

Additionally, the jury viewed the videotape of Sergeant Dempsie's second interview with Oscar the day of the shooting, in which Oscar identified defendant's photograph from a lineup but also said he saw two men named Juan and Michael in the room.

The trial court also admitted testimony from Oscar's therapist making clear that Oscar had long been mired in a "fantasy-reality tug of war." For example, she described a session where Oscar said that his mom was under the couch and talking to him — and another session where Oscar said that his mom had not been murdered but instead cut herself with a knife.

Defendant argues that the court erroneously excluded other items of evidence that had been admitted at previous trials. He also argues that because the previous trials had resulted in the jury being unable to reach a verdict, the different rulings at the third trial were prejudicial.

In addition to Oscar's statements that his father testified about at this trial, Jose H. had also testified at an earlier trial that a few weeks after the crimes, Oscar also told him the

following: Three men had entered the house the night of the crimes, cut the telephone cord, and manhandled Lorena and Ermanda. The men gave them beer, and soon Lorena was "face up" with two men while the third was with Ermanda. They heard firecrackers, and his mother hid him under the bed. Oscar ran to where the blood was and started to move his mother. His sister was in a room, and his mother was running all over. Jose H. also testified that Oscar no longer told him that any of these men had brought him ice cream.

The trial court also excluded at the instant trial statements that Oscar made to two investigators in Idaho three months after the shooting in which he went into lurid details about what he saw the morning of the shooting that were, as defendant puts it in his brief, not corroborated and "contradicted by the evidence and common sense." Specifically, Oscar said that a person he had seen with a gun got a hammer and hit him in the stomach and back and pulled his shirt. The man ran around and broke everything including a clock and toys. Oscar said he hid under the bed. He also said he was tied up with a rope, and the man gave him medicine to drink, but Oscar did not drink it. Oscar said the man broke a window, hit a door with the hammer, hit his sister on the head and stomach, and there was blood on the man's hat and hands.

Defendant also sought unsuccessfully to present additional statements from Oscar's prior testimony.

In light of the evidence of Oscar's statements that the court did admit at the third trial, as well as his actual trial testimony — in which he remembered little and identified a photograph of a man other than defendant as having been in the house that morning — and the other evidence defendant

presented challenging Oscar's credibility, the jury knew that, by the time he testified, more than two years after the shooting, Oscar's memory had been largely corrupted. The jury knew that Oscar's trial identification of defendant, which he quickly changed to say he did not remember, and his identification at trial of the photograph of a different man, were, by themselves, not reliable. Admission of the additional statements and more of his prior testimony would not have significantly added to the picture the jury already had concerning Oscar's testimony.

The real credibility issue for the jury to resolve was the reliability of Oscar's statements and identifications on the morning of August 4, 1997. Indeed, the credibility question was even narrower than that. It was undisputed, and corroborated by defendant himself, that Oscar correctly identified defendant as the man who had brought him ice cream. The only disputed question was the accuracy of Oscar's statement to Sergeant Dempsie that the man who brought him ice cream (i.e., defendant) was also the man he saw in the bedroom. Defendant was permitted to present all the evidence he wished concerning the statements of August 4, 1997, and the surrounding circumstances, including what occurred in the Chandi house that morning.

The jury knew from the evidence actually presented that, very soon after his initial statement, Oscar began adding new details that were inconsistent and incredible. Defendant presented much evidence, including expert testimony, that accounted for this. Some of Oscar's statements that were admitted at earlier trials but excluded from this one were perhaps more lurid and incredible than the admitted statements. But under all of the circumstances, excluding those statements was not prejudicial. What was important, and what

became obvious to the jury, was that Oscar's memory was quickly corrupted by the many factors defendant identified at trial. Further evidence on that score would have done little to undermine the credibility of Oscar's initial statement implicating defendant, which he made very soon after the incident and which was largely corroborated by defendant himself and the positioning of the bodies. Because Oscar had learned in the interim that defendant was named Juan, we also see little significance in the fact that, in later statements to his father, Oscar simply used defendant's name and no longer referred to him as the man who brought him ice cream.

For these reasons, to the extent any error was of state law, we would find it harmless because it is not reasonably probable the result would have been more favorable to defendant had the excluded evidence been admitted. (*People v. Merriman, supra,* 60 Cal.4th at p. 69.) Defendant also contends the rulings violated his federal constitutional rights, including the right to confront witnesses. To establish a violation of his right of confrontation, defendant must show that the excluded evidence "would have produced 'a significantly different impression of [the witness's] credibility.' " (*People v. Frye* (1998) 18 Cal.4th 894, 946, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) On this record, we cannot say that he has made that showing. Nor can defendant show that the rulings made the trial fundamentally unfair. (*Merriman,* at p. 70.)

### f. *Restricting the Testimony of a Defense Expert Witness*

As part of his effort to challenge Oscar's credibility, defendant called Dr. Susan Streeter to provide expert testimony

on the reliability of child witnesses. Defendant contends the court erroneously restricted the scope of her testimony.

Before Dr. Streeter testified, the prosecutor objected to any testimony expressing her opinion of Oscar himself. Citing *People v. Page* (1991) 2 Cal.App.4th 161, the court ruled that Dr. Streeter could testify about factors that could affect a child's credibility, but she could not give an opinion regarding Oscar's own credibility. Specifically, the court ruled that "Doctor Streeter is certainly qualified and may testify about Oscar's developmental stage and the general principles that apply to a child of that age insofar as reliability is concerned. . . . If she has an opinion generally as to children of that developmental age as to reliability, she may discuss those principles. . . . She may state the general principles involved as to a child of that developmental age, but beyond that, there's ample evidence before the jury to make that determination, and the proffered expert testimony would not be admissible." The court also prohibited Dr. Streeter from citing hearsay evidence that would have supported her opinion regarding Oscar's credibility.

Defendant contends the court erred in restricting Dr. Streeter's testimony in this way. It did not. "When expert opinion is offered, much must be left to the trial court's discretion." (*People v. Carpenter, supra*, 15 Cal.4th at p. 403.) We see no abuse of discretion. In *People v. Page, supra*, 2 Cal.App.4th 161, the case the trial court cited, an expert testified about factors that could cause a false confession. The Court of Appeal held that the trial court acted properly in not additionally permitting the expert "to discuss the particular evidence in this case or to give his opinion regarding the overall reliability of the confession." (*Id.* at p. 188.) It was for the jury,

not an expert, to determine the reliability of the actual confession. (*Id*. at pp. 187-189.)

Similarly, the trial court properly permitted Dr. Streeter to testify about factors the jury should consider in judging Oscar's credibility and the reliability of his statements of August 4, 1997, and then leaving it to the jury to apply that testimony to the actual facts. "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82; see *People v. Smith* (2003) 30 Cal.4th 581, 628 [similar]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39 [abuse of discretion to *admit* expert opinion that a witness was credible].) The jury heard Dr. Streeter's testimony, it heard Oscar's testimony and could observe his demeanor, and it heard the remaining testimony relevant to his credibility. It was fully qualified to judge for itself, without additional expert help, the credibility and reliability of Oscar's testimony and his statements of August 4, 1997.

Contrary to defendant's additional argument, because the trial court properly prohibited Dr. Streeter from giving an opinion regarding Oscar's actual credibility, it also properly prohibited her from citing hearsay evidence to support that prohibited opinion. We see no error.

### 2. *Admission of Defendant's Confession*

Defendant argues that the court should have excluded his confession on two grounds: (1) it was tainted by a violation of

the rules of *Miranda v. Arizona*, *supra*, 384 U.S. 436, during the August 5, 1997, interview between Detective Shear and defendant; and (2) it was involuntary.

### a. Factual Background

Before the first trial, defendant moved to exclude his confession, and the court presided over an evidentiary hearing concerning the interviews between defendant and police culminating in his confession. The testimony at the hearing was generally consistent with the evidence later presented at trial, except that it contained some testimony relevant to the suppression motion not presented at trial. We will focus on the testimony relevant to defendant's arguments.

The August 5, 1997, interview between Detective Shear and defendant was recorded; the court listened to critical portions of the recording. The purpose of the interview was for the detective to give defendant a "voice stress analyzer" test. Defendant had agreed to submit to questioning to prepare for the test and then to take the test itself. Detective Shear testified that the first part of the interview was "a preinterview for the purpose of preparing the questions for the examination." At the outset of the interview, he reminded defendant of the *Miranda* rights that he had previously waived. He said, "All those rights still apply to you, Juan. You have the right to remain silent, you don't have to talk to us, you don't have to submit to this test, you have the right to talk to an attorney and everything." He added, "You know that you don't have to talk to me? You don't have to. You can say I don't want to talk to you. I don't want to take this test. I don't want to talk to you. Do you want to talk to me? Will you answer questions for me?" Defendant responded, "Yes, why not?"

Later in the interview came an exchange during which defendant contends he invoked his right to remain silent. After listening to the tape, the court found the following occurred. Defendant said, "I want you to put the machine, sir." Detective Shear said, "Beg your pardon?" Defendant said, "I want you to put the machine on me." Detective Shear responded, "Yeah, I know." Defendant said, "I'm not going to say nothing more. I told you the truth. That's the truth." Detective Shear asked, "Now you just want to take the test?" Defendant responded, "Yes." Detective Shear continued asking defendant questions about the case and eventually administered the test.[3] Defendant still denied involvement in the murders.

As at trial, defendant testified that the police repeatedly threatened him and ignored his requests to have an attorney, testimony the officers denied.

The court denied defendant's suppression motion in a written ruling. It found not credible defendant's testimony that he had been threatened and had repeatedly requested counsel; it found credible the officers' contrary testimony. It also found that defendant had not been coerced. After quoting the colloquy that defendant contended constituted an invocation of the right to silence, the court stated, "Considering the content of the exchange and the surrounding circumstances, the court does not find Mr. Sanchez invoked his right to terminate questioning." In a separate ruling, the court also found that the investigators never advised defendant of his consular rights under the Vienna

---

[3] At defendant's request, the court ordered that the test itself not be mentioned at trial.

Convention on Consular Relations, but that the failure to do so did not require suppression of the confession.

### b. *Analysis*

When reviewing a ruling admitting a confession, we accept the trial court's resolution of any factual dispute to the extent the record supports it, but otherwise we determine independently whether the confession was taken in violation of the rules of *Miranda v. Arizona, supra*, 384 U.S. 436, or was involuntary. (*People v. Duff* (2014) 58 Cal.4th 527, 551.) On both questions, the People bear the burden of proof by a preponderance of the evidence. (*Ibid.*) Here, defendant and the officers provided sharply differing testimony of what occurred. The court resolved this factual dispute by finding the officers credible and defendant not credible. The record, including the taped statements themselves, supports the court's credibility determination, and we accept it. (*People v. Dykes* (2009) 46 Cal.4th 731, 751.) Accordingly, we will consider the taped statements and the officers' testimony, but not defendant's contrary testimony, to determine independently whether the confession was admissible.

Defendant contends he invoked his right to remain silent when he told Detective Shear during the August 5, 1997, interview, "I'm not going to say nothing more. I told you the truth. That's the truth." If a defendant invokes his *Miranda* rights, questioning must cease. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1122.) However, when, as in this case, a defendant has waived his *Miranda* rights and agreed to talk with police, any *subsequent* invocation of the right to counsel or the right to remain silent must be unequivocal and unambiguous. (*Berghuis v. Thompkins* (2010) 560 U.S. 370,

381-382 [right to remain silent]; *Davis v. United States* (1994) 512 U.S. 452, 461-462 [right to an attorney].) "The question whether a suspect has waived the right to counsel with sufficient clarity prior to the commencement of interrogation is a separate inquiry from the question whether, *subsequent* to a valid waiver, he or she effectively has invoked the right to counsel. [Citations.] It is settled that in the latter circumstance, after a knowing and voluntary waiver, interrogation may proceed 'until and unless the suspect *clearly* requests an attorney.' (*Davis v. United States* [, *supra*,] 512 U.S. [at p.] 461, italics added.) Indeed, officers may, but are *not required* to, seek clarification of ambiguous responses before continuing substantive interrogation. (*Id.* at p. 459.)" (*People v. Williams* (2010) 49 Cal.4th 405, 427.) The same rules apply to an invocation of the right to silence as apply to the invocation of the right to counsel. (*Berghuis v. Thompkins*, at p. 381; *Williams*, at pp. 433-434.)

"[T]he question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the invocation — what would a *listener* understand to be the defendant's meaning. The high court has explained — in the context of a postwaiver invocation — that this is an objective inquiry, identifying as ambiguous or equivocal those responses that 'a reasonable officer in light of the circumstances would have understood [to signify] only that the suspect *might* be invoking the right to counsel.' . . . [¶] In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends." (*People v. Williams*, *supra*, 49 Cal.4th at pp. 428-429.) "A defendant has not invoked his or her right to

silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning." (*People v. Rundle* (2008) 43 Cal.4th 76, 115.)

In context, defendant's statement, "I'm not going to say nothing more," was not an unambiguous invocation of his right to remain silent. Instead, the statement showed impatience to take the voice stress analyzer test. Other than the one statement, defendant was cooperative during that interview and always willing to talk. We agree with the trial court's analysis: "In context, Mr. Sanchez was not seeking to terminate the interview. Shear had explained to Mr. Sanchez the voice stress test was like a lie detector and would determine whether Mr. Sanchez was telling the truth when he denied involvement in the deaths of his friends. At the point of dispute, Mr. Sanchez did not state he wanted to be silent. He did not indicate a refusal to talk about the case. By implication, he indicated impatience with Shear's pretest interrogation and clearly stated he wanted to proceed to the test portion of the interview. Mr. Sanchez's insistence that Shear proceed with testing him by the 'machine' does not equate to an invocation of his right of silence."

Contrary to defendant's additional arguments, nothing else in the interview between Detective Shear and defendant supports the conclusion that he invoked his right to silence. Because we find that defendant did not unequivocally invoke his right to silence, we need not consider the Attorney General's further argument that any *Miranda* violation on August 5 (when defendant continued to deny guilt) did not taint his confession the next day, which was preceded by another waiver of his rights.

Defendant also contends his confession was involuntary. He "is of course correct that '[a]n involuntary confession may not be introduced into evidence at trial.'" (*People v. Spencer* (2018) 5 Cal.5th 642, 672.) "'A statement is involuntary if it is not the product of "'a rational intellect and free will.'"" (*Mincey v. Arizona* (1978) 437 U.S. 385, 398.) The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed."'"" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.) "In assessing whether statements were the product of free will or coercion, we consider the totality of the circumstances, including '"'the crucial element of police coercion,'"' the length, location, and continuity of the interrogation, and the defendant's maturity, education, and physical and mental health." (*People v. Duff*, *supra*, 58 Cal.4th at pp. 555-556.) Police coercion is, indeed, crucial. To be considered involuntary, a confession must result from coercive state activity. (*Colorado v. Connelly* (1986) 479 U.S. 157, 165; *People v. Smith* (2007) 40 Cal. 4th 483, 502.)

Defendant's testimony would have supported a finding that his confession was coerced. But, as noted, the trial court discredited that testimony in favor of the officers' testimony that they did not threaten or coerce him. We accept that credibility finding. Except for defendant's testimony, there was no evidence of police coercion. Although there were multiple interrogations, none was particularly lengthy, and they were spread out over three days. He ultimately confessed about 20 to 30 minutes into an interview that began after he had eaten lunch. Because there was no police coercion, defendant confession was not involuntary.

As defendant notes, the police did not notify him of his consular rights under article 36 of the Vienna Convention on

Consular Relations. Defendant is a Mexican national, although it appears that at the time of his arrest, he had lived in this country longer than he lived in Mexico. However, "the United States Supreme Court made it clear that an officer's failure to notify a suspect of his or her consular rights does not, in itself, render a confession inadmissible." (*People v. Enraca* (2012) 53 Cal.4th 735, 756, citing *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331.) Instead, "[a] defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police." (*Sanchez-Llamas*, at p. 350.) Defendant has done so. But nothing about the failure to notify defendant of this right coerced him into confessing. "As the *Sanchez-Llamas* court noted, article 36 'secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention — not to have . . . law enforcement authorities cease their investigation pending any such notice or intervention.' (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 349.)" (*Enraca*, at p. 758.) We have no basis on which to find the confession involuntary.

For these reasons, we uphold the trial court's ruling admitting the confession.

### 3. Admission of Evidence of Defendant's Sexual Relationship with a Witness

Over objection, the trial court admitted evidence that defendant and prosecution witness Hernandez had had a sexual relationship. Defendant contends the court erred.

### a. Factual Background

During Detective Shear's testimony, the prosecutor sought to admit evidence of Hernandez's sexual relationship with defendant. He argued it was relevant: (1) to defendant's

veracity in his interview with Detective Shear, when he said differing things regarding his relationship with Hernandez; and (2) to Hernandez's credibility, particularly his credibility when he denied seeing defendant the morning of the murders. The court deferred a ruling pending further evidence, and the proffered testimony was not presented at that time. Later, the prosecutor again sought to present the evidence. Defendant objected to the evidence as unduly prejudicial.

The court ruled the evidence admissible: "There is certainly a legitimate concern about potential undue prejudice, and I recognize that. However, I agree that . . . the veracity of Mr. Hernandez is a critical issue in this case. It certainly makes a great deal of difference whether or not Mr. Sanchez's wife, who has provided an alibi that he was asleep at the time the murders occurred, whether or not that is true, or whether or not he was active and about in the community of Porterville at or about the time of the homicide. There are also other reasonable inferences that can be drawn depending upon what the fact finder finds to be the situation. There is a material difference between a friendship, even a close friendship, and an intimate relationship, particularly an intimate relationship wherein the person whose veracity is at issue has expressed love for the principal at issue." The court found the probative value of the evidence outweighed any potential for prejudice.

Thus, the court permitted testimony from Hernandez regarding his sexual relationship with defendant (see pt. I.A.2, *ante*), and cross-examination of defendant regarding that relationship and statements he made about it to Detective Shear and Sergeant Garay. (See also pt. II.A.5, *post* [concerning a related contention].) Defendant admitted in court that he had

had a sexual relationship with Hernandez but denied that it lasted five years, as Hernandez had testified.

At defendant's request, the court agreed to give the jury a limiting instruction, and it did so on three occasions. The first occurred at the beginning of Hernandez's testimony regarding the relationship. The court admonished: "This evidence is being introduced for the purpose of showing, if it does, that Mr. Sanchez and Mr. Hernandez were engaged in a consensual sexual relationship and on more than one occasion. This evidence . . . is admitted for a limited purpose. It may be used to judge the credibility and believability of Mr. Hernandez when he denied seeing Juan Sanchez on August the 4th, 1977 [*sic*], at about five o'clock in the morning. It may be used to evaluate the truthfulness of Mr. Sanchez's statements to Detective Shear relating to his relationship with Mr. Hernandez, and it may be used in considering the credibility and believability of Mr. Sanchez's testimony at trial. It absolutely is not being introduced for any other purpose unless I direct you otherwise."

The court added, "Obviously, consensual adult sexual relationships are not illegal in our society. As a matter of fact, there are constitutional protections in place that recognize that." It instructed that if any juror could not accept the limiting instruction, the juror should so inform the bailiff. No juror did so.

During a break in the testimony, outside the jury's presence, defense counsel requested the court also to tell the jury that the evidence could not be considered to show a propensity to commit the charged crimes. The court stated that it had "intentionally left it out because sexual relationships between two adults is not bad character. That's why instead of

saying bad character and . . . giving it a negative connotation, I gave it a positive connotation by reminding the jurors that it's constitutionally protected." The court added that the evidence did have some probative value because it "suggests that Mr. Sanchez is not averse to sodomy." But the court offered to give a more complete admonition during jury instructions. The prosecutor also noted that the court had erroneously stated the year 1977 instead of 1997. But everyone agreed the mistake could not have confused the jury.

The second admonition came during cross-examination of defendant. The court again explained that "there was evidence introduced yesterday again on the consensual sexual relationship between Mr. Sanchez and Hector Hernandez. I just want to remind you I've already given you a limited instruction on the use of that evidence, and I just want to remind you at this point again that it is being offered for a limited purpose of, among other — excuse me, the limited purpose of judging the credibility of Mr. Hector Hernandez. It may be used in considering the truthfulness of Mr. Sanchez's testimony in court. It may be used to consider the truthfulness of Mr. Sanchez's testimony relating to his whereabouts on the morning in question, and as I believe I already mentioned, it may be used in judging Mr. Sanchez's credibility. It is admitted for those limited purposes." A short time later, the court added, "And I think this goes without saying, that you're not permitted to consider that evidence for any other purpose than one that the court has instructed you may consider, and you will get a formal jury instruction on this at the time of jury instructions."

The third admonition came as part of the jury instructions after the evidence had been presented. The court stated: "Evidence has been introduced for the purpose of showing, if it

does, that the defendant and Hector Hernandez were engaged in a consensual sexual relationship. Such evidence, if believed, may not be considered by you to prove that Mr. Sanchez is a person of bad character or that he has a disposition to commit crimes, including the crimes for which he is now charged. Such evidence, if believed, may be considered by you only for the limited purpose of determining if it tends to show the following: . . . The credibility/believability of Mr. Hector Hernandez when he denied seeing Juan Sanchez on August the 4th, 1997, at or about five o'clock in the morning; the credibility/believability of Juan Sanchez's statements to police officers and his testimony at trial. For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case. You are not permitted to consider this evidence for any other purpose."

### b. *Analysis*

Defendant contends the court erred in admitting the evidence because it was irrelevant and, even if relevant, it should have been excluded as unduly prejudicial under Evidence Code section 352. "The trial court enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice, confusion, or consumption of time substantially outweigh the probative value of particular evidence." (*People v. Clark, supra*, 63 Cal.4th at p. 572.) We see no abuse of discretion. The court carefully exercised its discretion. Its ruling was not arbitrary, capricious, or absurd. (*Ibid.*)

" 'Relevant evidence' means evidence, *including evidence relevant to the credibility of a witness* or hearsay declarant, having any tendency in reason to prove or disprove any disputed

fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) If relevant, a court has discretion to admit evidence of a sexual relationship. (*People v. Holloway* (2004) 33 Cal.4th 96, 132-134 [evidence admitted at the defendant's request over the prosecution's objection with a limiting instruction].)

Here, as indicated in the trial court's ruling, although the evidence was somewhat relevant to judging the credibility of defendant's denial of guilt in the interview with Detective Shear and his trial testimony, it was primarily admitted on the question of Hernandez's credibility. Defendant presented an alibi that he was asleep in his bed between around 4:30 and 6:30 to 7:00 a.m. the morning of the murders. Hernandez testified that, the night before, he had asked defendant to give him a ride to work that morning. Defendant was supposed to come to Hernandez's home around 6:00 a.m. Evidence, including testimony from Hernandez's brother, showed that Hernandez called his brother for a ride just after 5:30 a.m. because he feared defendant would not come. Calling him that early would be odd if Hernandez had no reason at 5:30 a.m. to believe defendant would not arrive by 6:00 a.m. Margarita Ruiz testified that Hernandez told her that defendant had been at his house at 5:00 a.m. that morning. If so, that would disprove defendant's alibi, something obviously of consequence to determining his guilt. It would also place defendant within about a three-minute drive of the crime scene shortly before the murders, and it would show that defendant did not give Hernandez the promised ride to work but instead was doing something else during the time the crime was committed. Hernandez denied seeing defendant that morning. As the trial court explained in exercising its discretion, whether this denial was credible was an important

question at trial. That Hernandez had a sexual relationship with and loved defendant showed possible bias and was probative of his credibility.

Moreover, the court gave pointed and emphatic limiting instructions not once, but three times during the trial. "We presume the jury understood and followed the instruction." (*People v. Homick* (2012) 55 Cal.4th 816, 873.) Defendant contends the limiting instructions were inadequate, and the court should instead have given a slightly different instruction that his attorney suggested. We disagree. The instructions were precise and carefully limited the jury's consideration of the evidence to its proper sphere. We see no error.

### 4. *Admission of Evidence That Defendant Possessed a Firearm*

Over defendant's objection, the court admitted evidence that he possessed a firearm around the time of the murders. Defendant contends the court erred. Preliminarily, the Attorney General argues defendant forfeited any argument as to Catherine Barrera's testimony because he did not object to it at the third trial. However, defendant did object to the testimony at the first two trials. Before the third trial, the court stated that it was reiterating its rulings made during the first two trials. Under the circumstances, defendant's previous two objections were sufficient to preserve the contention.

Turning to the merits, we see no error. Defendant invokes the rule, established in *People v. Riser* (1956) 47 Cal.2d 566, 577, and reiterated in *People v. Barnwell* (2007) 41 Cal.4th 1038, 1056, that it is generally error to admit evidence that the defendant possessed a weapon that could not have been the one used in the charged crime. That rule does not apply here. Here,

the murder weapon was never found, but the evidence showed it was likely a nine-millimeter firearm. The firearm the witnesses testified about could easily have been the one used in the murders. "Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. Unlike *People v. Riser, supra*, 47 Cal.2d at page 577, this evidence did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon . . . . The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1052; see *People v. Cox* (2003) 30 Cal.4th 916, 956 [similar].)

Evidence that shortly before the murders defendant possessed a firearm that could have been the murder weapon was similarly relevant and admissible as circumstantial evidence that he committed the murders. Contrary to defendant's additional argument, we see no abuse of discretion in not excluding the evidence as unduly prejudicial under Evidence Code section 352.

### 5. Cross-examination of Defendant

Defendant contends the court erred in permitting certain cross-examination when he testified.

### a. Factual Background

At one point in the interview between defendant and Sergeant Garay, after confessing to shooting the victims, defendant said, "I don't want to talk anymore, Garay. No more. But I can help you." At a pretrial hearing, the trial court ruled that this statement was an invocation of defendant's right to silence, and it ordered the prosecution not to present in its case-in-chief evidence of any later statements.

During his cross-examination of defendant, the prosecutor
informed the court outside the jury's presence that, to impeach
defendant's credibility, he wanted to question defendant about
statements he made to Sergeant Garay after he invoked his
right to silence regarding his relationship with Hernandez. The
prosecutor argued that defendant "lied to Garay, and he did so
after, the date after admitting, and he goes back to lying. Lying
seems to be the most comfortable communication for him and
that's what I'm seeking to demonstrate for the jury." The court
asked how the statements were inconsistent with defendant's
trial testimony. The prosecutor responded: "It's not a
consistency. It goes merely to show he has lied in this case in
the past when asked direct questions." The court deferred a
ruling and asked the prosecutor to provide authority supporting
the request.

Later, citing *Harris v. New York* (1971) 401 U.S. 222, the
court ruled that statements made after defendant invoked his
right to silence could be used for impeachment. The court stated
that it would give the jury a limiting instruction. Defendant
objected under Evidence Code section 352. The prosecutor
reiterated why the testimony would be impeaching: "I think it's
very relevant that [defendant] is denying yet again on the day
that he's making his confession because . . . [defense] counsel
seeks to argue that his confession is tainted because he
obviously cannot come up with true factors related to the
murders, and that's because he doesn't know about the murders,
and that's why he is unable to come up with these and that
shows that he's an innocent person who's falsely confessing.
However, at the same time that he's being asked about that and
not coming up with what is factually accurate with the murder
scene, he's also being asked about his relationship — or he has

been asked about his relationship with Hector, certainly a subject that he would have intimate knowledge about, and he's not coming up with the truth, either, until pressed. And so it's very relevant."

The court permitted the requested impeachment, finding it "very probative for the very reasons that [the prosecutor] stated. It certainly is the type of evidence that can if improperly —unless there are appropriate cautions to the jury, it is the type of evidence that can certainly cause prejudice and on occasion undue prejudice. However, in this case, given the nature of the issues in this case, particularly the issue relating to the confession, Mr. Sanchez's — the testimony of Hector Hernandez and his veracity and the other limited purposes for which it . . . has been offered previously, it is probative and its probative value certainly outweighs . . . any undue prejudicial effect. So I have weighed those factors and will allow it and deny the objection under [Evidence Code section] 352."

The prosecutor questioned defendant about statements he made to Sergeant Garay regarding his relationship with Hernandez that occurred after the point at which the court had ruled defendant invoked his right to silence. Defendant testified that he originally denied having a sexual relationship, then gradually admitted it when asked further questions.

In addition to the limiting instructions described in part II.A.3.a, *ante*, the court gave the following instruction at the end of the evidence portion of trial: "At one point in the videotaped statement to Sergeant Garay, Mr. Sanchez stated, quote, 'I don't want to talk anymore,' unquote, and I believe that's found on page 44 of the transcript that is in evidence. In any event, as to any statements made by Mr. Sanchez to Sergeant Garay after

this point in time, you are to consider only such statements, if any, that are inconsistent with his trial testimony. Any such statements may be considered by you only for the purpose of testing the defendant's credibility. You are not to consider such statements as evidence of guilt. This limiting instruction does not apply to statements which you find were made prior to Mr. Sanchez's statement, 'I don't want to talk anymore.' " The court then repeated the instruction.

### b. Analysis

Defendant contends the court should have prohibited the cross-examination into his sexual relationship with Hernandez both because it was unduly prejudicial under Evidence Code section 352 and because the cross-examination about his statements to Sergeant Garay violated his *Miranda* rights.

The first argument largely reprises his similar argument challenging the evidence previously admitted about the relationship between defendant and Hernandez. (See pt. II.A.3, *ante*.) Although not strongly probative, the cross-examination was somewhat relevant to impeach defendant for the reasons the prosecutor and the court identified. One defense theory of the case, suggested in the defense's opening statement to the jury, was that defendant withheld information that the actual killer would have known, which showed that he was ignorant of that information; that, in turn, showed that his confession was false. Evidence that, even after he confessed, defendant continued lying and withholding information was probative on this point and was thus probative of the credibility of defendant's testimony that he confessed falsely. Because evidence of the sexual relationship had already been admitted,

any additional prejudicial effect was slight. We see no abuse of discretion under Evidence Code section 352.

A statement that is otherwise voluntary, but taken in violation of the *Miranda* rules, may be admitted to impeach a defendant who testifies. *(Harris v. New York*, *supra*, 401 U.S. 222; *People v. DePriest* (2007) 42 Cal.4th 1, 32.) Defendant contends this rule does not apply because his testimony on direct examination was not inconsistent with the admitted statements, and the cross-examination concerned only collateral matters. We need not resolve this point, because any error was harmless in light of the evidence that was properly admitted. The jury had already heard of the sexual relationship through Hernandez's own testimony, and defendant was also cross-examined about his evasive statements to Detective Shear. The brief cross-examination regarding defendant's statements to Sergeant Garay after he invoked his right to silence added little to what the jury otherwise knew.

Moreover, the court gave repeated instructions limiting the use the jury could make of this testimony, instructions we presume the jury understood and followed. Any error was harmless beyond a reasonable doubt.

### 6. *Admitting Testimony That Was Later Stricken*

The prosecutor, Deputy District Attorney David Alavezos, asked defendant on cross-examination questions about some testimony he anticipated he would present later. When he tried to present the testimony, it had to be stricken and the jury admonished to disregard it, because it turned out to be inadmissible hearsay. Defendant contends that, in the process, the court committed error, and the prosecutor committed misconduct.

### a. Factual Background

During presentation of the defense case, Alavezos stated outside the jury's presence that defense counsel had just informed him that the defense intended to call Lola Ortiz as a defense witness. He said that the defense "just gave me what looked like about a little over a hundred pages this morning on Lola Ortiz . . . ." He wanted to know for what purpose the defense intended to call her. He also said that Ortiz is "not a percipient witness to anything, so everything she testifies to is hearsay that she's heard from somebody else." Defense counsel clarified that she intended for Ortiz to testify that Ortiz had not seen defendant at the victim's home.

After this, Alavezos also stated that if defendant called Ortiz as a witness, he intended to present evidence that Ortiz had told two persons about a conversation between Ermanda and defendant shortly before the murders in which defendant threatened Ermanda's daughter. Alavezos acknowledged he understood that Ortiz herself was "denying this now," but the two people she told had in turn "independently told officers" that Ortiz told them she was present. Defense counsel asserted that Ortiz "always says like she was there," but "[w]hen you really ask her, it turns out it's hearsay from Ermanda, it's not admissible." Defendant objected on hearsay grounds, and the court made no ruling at the time.

The question arose outside the jury's presence again the next day. Defense counsel again objected to the evidence, stating that Ortiz had denied hearing the conversation between defendant and Ermanda. Counsel suggested that if Ortiz had heard of the conversation at all, she might have heard about it from Ermanda and did not personally overhear it. Alavezos

represented that two witnesses, Margaretta Zepeda and Maria Alicia Palomares, had told investigators in separate interviews that Ortiz told them that she was present during the conversation. He described what the witnesses had said. They said that Ortiz told them that "she was present when Juan had gone over to the victim's residence in the evening to be paid for some mechanical work he had done on Ermanda's car; that Ermanda told the defendant her car was running worse than before he had worked on it and told defendant Sanchez that if he would fix her car she would pay him. Defendant Sanchez then told Ermanda that if she didn't pay him, her daughter would pay him, and that [Ortiz] understood this to mean that he would harm Lorena." The prosecutor again acknowledged that Ortiz herself did not confirm this.

Based on these representations, the court found "sufficient foundation" for the evidence to be admitted. Defense counsel requested that it be stricken "if it turns out to be hearsay." Alavezos agreed not to "elicit the source" of the hearsay for the time being.

Later Alavezos sought to question defendant on cross-examination about this purported conversation between him and Ermanda. When defendant objected, the court ruled outside the jury's presence that the prosecutor could ask the question, and, if defendant denied the conversation occurred, it would admonish the jury that questions are not evidence. When the defense expressed doubt that an admonition would be effective, the court responded, "I have a lot of faith in jurors following the law. We went through extensive voir dire in this case with the questionnaire and everything else. These people appreciate their duties."

When cross-examination resumed, the prosecutor asked defendant about the conversation. Defendant denied that it occurred. At that point, the court admonished the jury: "Ladies and gentlemen, I think it's appropriate to remind you, once again, that questions of counsel are not evidence. Counsel has just asked two questions, Mr. Sanchez has denied it, and unless there is some other evidence relating to it, that's it. It didn't happen. You're not to speculate otherwise."

After these events, Ortiz testified as a defense witness that she had not seen defendant at the Reyes house and regarding some statements by Oscar. She was asked no questions about the conversation between Ermanda and defendant. Later, defense counsel objected under Evidence Code section 352 to the prosecutor's calling Ortiz to question her about the conversation. The court found the evidence probative and not unduly prejudicial.

Alavezos then called Ortiz as his own witness on rebuttal. She denied overhearing the conversation between Ermanda and defendant and further denied telling Zepeda or Palomares about it. At this point, the court admonished the jury: "Remember, ladies and gentlemen, the questions of counsel are not evidence. It's the testimony of the witness that is."

The prosecutor then called Zepeda as a witness. At a hearing outside the jury's presence, the court permitted Alavezos to ask leading questions to minimize the risk of the witness saying something prejudicial. On the stand and in the presence of the jury, Zepeda then denied that Ortiz told her about something defendant had said in Ortiz's presence. The prosecutor questioned her about what she had told the investigators. He asked, "Did you talk to them about what

[Ortiz] had told you that she heard Juan say?" Zepeda responded, "No, she did not hear. She was told by Ermanda."

At that point, at defense counsel's request, another hearing was held outside the jury's presence. Defendant asked that the testimony be stricken and moved for a mistrial. The court did not rule on the mistrial motion at the time, but it stated the belief than an admonition would be effective. The court then admonished the jury: "Ladies and gentlemen, there's been reference in the testimony about something that Ermanda purportedly said to somebody else was reported to somebody else, that's hearsay. That's totally unreliable. So that part of this witness's testimony is stricken. You shall disregard it. Do you all understand that? Do you all understand how important that is? This case is not going to be decided in any way by inadmissible hearsay. Some hearsay is admissible under the law, but some is so unreliable it does not come in, and this is exactly that type of unreliable hearsay. It's stricken. You shall disregard it in its entirety."

The prosecutor asked no further questions of Zepeda but called Palomares as a witness. She also denied that Ortiz told her that Ortiz was present when defendant made the statements. At that point, the jury was dismissed, and the witness was questioned further in its absence. Palomares said she did not know whether Ortiz actually heard the conversation between defendant and Ermanda or was merely relating what Ermanda had told Ortiz. The prosecutor then stated the intent not to question the witness further. The court said it would admonish the jury to disregard all of this testimony.

Defense counsel again moved for a mistrial. She claimed the prosecutor committed misconduct because he presented the

evidence knowing it was unreliable for the sole purpose of prejudicing the jury. The court asked Alavezos about his good faith belief. The prosecutor said he believed from a report by Investigator Florencio Camarillo that the witnesses had said Ortiz was present during the conversation between defendant and Ermanda.

Investigator Camarillo testified outside the jury's presence. He said he spoke with both Zepeda and Palomares. He read the relevant portion of his report, dated September 7, 1999: "Lola [Ortiz] told them the defendant Juan Sanchez had gone over to victim's residence in the evening to be paid for some mechanical work he'd done on her car. She told him [*sic*] that Ermanda told . . . defendant that her car was running worse than before he worked on it. Ermanda supposedly told defendant Sanchez that if he would fix her car, then she would pay him. Defendant Sanchez . . . then told Ermanda that if she didn't pay him, her daughter would pay him."

Investigator Camarillo testified he "assumed" and "received" the women's statements as meaning that Ortiz was present for the threat. But his report did not specifically address the point. Asked whether he told Alavezos about his conversations with Zepeda and Palomares, he said he had. Asked further whether what he told Alavezos included that Ortiz was present during the conversation, Camarillo answered, "That's how I understood it, yes."

The court denied defendant's mistrial motion. It found, "based upon what has been presented to me, that Mr. Alavezos had a good faith, although apparently mistaken, belief that . . . the last two witnesses would impeach Lola Ortiz if she's denied

the conversation." It expressed confidence that, given an admonition, the jury would disregard the testimony.

The court admonished the jury: "Ladies and gentlemen, all of the rebuttal evidence is stricken. You are to entirely disregard it. Now, by rebuttal evidence, I'm talking about the evidence today of Lola Ortiz, and thank you for crossing those out of your notes, if you made any notes." The court also struck the testimony of Zepeda and Palomares, adding: "You are to entirely and totally disregard it. It is unreliable and shall not be considered by you in any way whatsoever. You're to strike it from your mind right now, totally. And I'm not only talking about the testimony, obviously. By striking testimony, that means that the questions of counsel are out, as well, because questions of counsel, as you well know, as I've previously admonished you many times, are not evidence. So there's absolutely nothing to consider relating to the testimony of those three witnesses." The court then asked each juror in turn whether that juror understood the admonition and would follow it. All responded affirmatively.

The court readmonished the jury as part of its overall instructions after the presentation of evidence: "The entire testimony of the witnesses Lola Ortiz, Margaretta Zepeda, and Marie Palomares, given on Friday, October 9th, 1999, was stricken by the court. You are instructed to entirely disregard that evidence and not consider it in any way. You are reminded of that instruction." It clarified that the jury *could* consider Ortiz's earlier testimony when she testified as a defense witness.

### b. *Analysis*

Defendant contends the court erred in not holding a hearing to determine whether Ortiz had personal knowledge

about the purported conversation between him and Ermanda. It did not err.

"Subject to Section 801 [concerning expert witnesses], the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witnesses may testify concerning the matter." (Evid. Code, § 702, subd. (a); see *People v. Anderson, supra,* 25 Cal.4th at p. 573.) In this case, the court's discussion with counsel of Ortiz's potential testimony made clear that the threat would be admissible only if Ortiz testified she heard defendant threaten Ermanda, which neither attorney expected, or if Zepeda and Palomares testified Ortiz told them she had overheard the threat. Given the parties' uncertainty about what the witnesses would say, the potentially prejudicial nature of the information, and the inherent difficulty of stopping a jury from considering information once it has been received, it would have been prudent for the court to avoid potential prejudice by examining the witnesses beforehand outside the jury's presence. (Evid. Code, §§ 402, 702.)

Although the court did not examine the witnesses beforehand, it did hold a hearing. The prosecutor represented that he had witnesses who would testify that Ortiz did have personal knowledge of the conversation even if Ortiz denied it. The court then permitted the prosecutor to call Ortiz herself as a witness. When she denied the conversation, it permitted the prosecutor to call the two witnesses (Zepeda and Palomares) who, the prosecutor represented, would supply the missing evidence. The two witnesses testified from personal knowledge, although not in the way the prosecutor anticipated. If, as anticipated, the two witnesses had testified that Ortiz told them

she heard the conversation, the evidence would have been admissible. The statements from defendant to Ermanda would have come within the exception to the hearsay rule for statements of a party. Ortiz's statements to Zepeda and Palomares would have come within the exception to the hearsay rule for prior inconsistent statements. (Evid. Code, §§ 1201, 1220, 1235; see *People v. Anderson* (2018) 5 Cal.5th 372, 403.) When it turned out that the witnesses did not establish that Ortiz spoke from personal knowledge, the court struck the testimony and admonished the jury. (See Evid. Code, § 403, subd. (c)(2) [the court "[s]hall instruct the jury to disregard the proffered evidence if the court subsequently determines that a jury could not reasonably find that the preliminary fact [Ortiz's personal knowledge] exists"].)

Defendant relies primarily on *People v. Valencia* (2006) 146 Cal.App.4th 92. In *Valencia*, a conviction of sexual crimes was based partly on hearsay statements of a person who had "consistently and repeated stated" that she "lacked *personal knowledge*" of the charged crimes. (*Id*. at p. 104.) It appears that no effort was made to show that the declarant did, indeed, have personal knowledge, and the evidence was admitted without objection. The Court of Appeal found defense counsel ineffective for not objecting to the hearsay testimony. "In the absence of personal knowledge, a witness's testimony or a declarant's statement is no better than rank hearsay or, even worse, pure speculation." (*Id*. at pp. 103-104.) This case is entirely different. Here, based on the prosecutor's representation, the court did not clearly err in permitting the prosecutor to try to establish the requisite personal knowledge. When the testimony differed from what was expected, the court struck the testimony. In contrast to *Valencia*, where the jury

was permitted to consider the inadmissible hearsay, here the court instructed the jury not to consider it.

In any event, no prejudice actually resulted. "[T]he court firmly instructed the jury to disregard the testimony, and we presume the jury did so." (*People v. Melendez* (2016) 2 Cal.5th 1, 33.) Defendant contends the admonitions were inadequate. We disagree. The admonitions were squarely on point and clearly instructed the jury on its duty. Indeed, the court took the extraordinary step of polling the jurors individually to ensure that each understood and would follow the admonition.

To the extent defendant contends the court erred in not granting the mistrial motion after Zepeda stated that Ortiz had been "told by Ermanda," we disagree. We review the denial of a mistrial motion for abuse of discretion. (*People v. Rices* (2017) 4 Cal.5th 49, 92.) "A court should grant a mistrial motion based on a witness's statement if it judges the defendant has been prejudiced in a way that an admonition or instruction cannot cure. Because this is inherently a speculative matter, the trial court has considerable discretion in ruling on a mistrial motion." (*Ibid.*) Here, the trial court participated in selecting this particular jury, and it knew the jury well. It was confident that an admonition would cure any harm. We have no reason to disagree or find the court abused its discretion.

Defendant also contends the prosecutor committed misconduct in two respects. First, he contends the prosecutor committed misconduct in cross-examining him about the conversation. " 'It is improper for a prosecutor to ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist.' " (*People v. Bolden* (2002) 29 Cal.4th 515, 562.) However, "as long as he had a good faith

belief in the existence of the preliminary fact [citation], the prosecutor was entitled to ask defendant" these questions. (*People v. Lucas* (1995) 12 Cal.4th 415, 467.) Defendant contends the prosecutor did not act in good faith. However, after holding a hearing, the court found otherwise, and it also found that an admonition would cure any harm. "The record supports these determinations and we adopt them as our own." (*People v. Warren* (1988) 45 Cal.3d 471, 482.)

The prosecutor stated the source of his belief that Ortiz had personal knowledge: a report from Investigator Camarillo. Although the report did not say so, Camarillo testified that he assumed or understood that Ortiz had personal knowledge of the threat, and in conveying the report to the prosecutor he also conveyed that understanding. This testimony, along with the prosecutor's representation he expected Zepeda and Palomares to testify that Ortiz told them she witnessed the threat, supplied substantial support for the trial court's finding of good faith.

While we do not overturn the trial court's finding, we note that the prosecutor knew that Ortiz would likely deny knowledge of the threat. Indeed, when she testified, Ortiz denied overhearing the threat and even denied telling Zepeda and Palomares about it. Thus, the prosecutor knew he would have to rely on Zepeda and Palomares to make the testimony admissible. But the report of those witnesses' statements did not specifically state that Ortiz had overheard the threat. In this circumstance, it would have been prudent for the prosecutor, no less than for the court, to verify the threat's admissibility before questioning witnesses about it in front of the jury.

Defendant also contends the prosecutor committed misconduct by not admonishing the witnesses before calling them. Defendant appears to focus on Zepeda's statement that Ortiz "was told by Ermanda." "A prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence. [Citations.] If the prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement." (*People v. Warren, supra*, 45 Cal.3d at pp. 481-482.) Defendant did not object on this basis at trial, thus forfeiting the contention. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.) Because defendant did not object, the record does not indicate whether the prosecutor had reason to believe any witness would state something inadmissible, or whether he did or did not admonish the witnesses. (*Ibid*.) The record does reflect that the prosecutor requested and was given permission to ask leading questions to minimize the risk of eliciting inadmissible evidence. The prosecutor also stated his intention not to elicit the source of the statements for the time being. He asked Zepeda a yes or no question designed not to elicit the inadmissible statement that the witness, nonetheless, blurted out. In any event, as we have explained, the court's admonitions sufficed to prevent prejudice.

Something similar occurred in *People v. Melendez, supra*, 2 Cal.5th at pages 31-33. There, the prosecution presented evidence that a witness had been injured in a criminal assault. The circumstances in which the evidence was presented implied that the defendant had committed the crime. But anticipated evidence connecting the defendant to the crime never materialized, and the trial court had to admonish the jury to disregard the testimony. We found no error and, given the

admonition, no prejudice. We further explained that "[w]hat occurred here was unfortunate, but it is the sort of event that sometimes happens in a trial. . . . Witnesses sometimes blurt things out or . . . testify in unanticipated ways. We have to trust the trial court to take corrective measures when necessary, as the court here did, and the jury to follow the court's instructions. It would be easy for the jury to understand that no evidence was ever introduced to show that defendant was responsible for the witness's injury, and therefore it had to disregard her testimony. We have no basis even to speculate that the jury based its verdict on the stricken testimony rather than the evidence it properly heard." (*Id.* at p. 33.)

The same is true here. The jury could easily understand that the stricken testimony was, as the court repeatedly stated, "unreliable," and the jury had to disregard it. As in *People v. Melendez*, *supra*, 2 Cal.5th 1, we find neither error nor prejudice in Zepeda's unexpected testimony.

### 7. *Alleged Prosecutorial Misconduct During the Closing Argument*

Defendant contends the prosecutor committed misconduct during his guilt phase closing argument to the jury.

The prosecutor argued: "[T]hat's where Ermanda got killed, outside her daughter's door, watching, most likely, her daughter dying. She has one other child in the house, and she gets to her bedroom where that child is and she gets on the phone. The defendant goes in there and she's not even able to call the police. She died not knowing if her youngest was going to make it, but knowing her oldest hadn't."

Defendant objected to the argument outside the jury's presence on the ground that the prosecutor was "prejudicing and

trying to inflame the jury." The court found no misconduct but stated that "if there is a pattern that is established, then the court will deal with it appropriately. Prosecutor is on notice of the defense's objection. There is a . . . line between what is argument and inflaming. I'm not ruling the prosecutor has reached the point of inflammatory argument. Defense [counsel] has put her concern on record, and the court will continue to listen to the argument and, if there's a further objection, I'll consider it." The prosecutor then turned to other matters in his jury argument and did not return to this theme.

Defendant argues that the prosecutor committed misconduct by "by inviting the jury to imagine [Ermanda's] last thoughts." We have repeatedly stated that it is " 'improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.) More specifically, we have said that "[i]n the guilt phase of a trial, it is misconduct to appeal to the jury to view the crime through the eyes of the victim." (*People v. Mendoza* (2007) 42 Cal.4th 686, 704; see *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [similar].)

Here, the prosecutor only indirectly suggested that the jury should view the crime through Ermanda's eyes. Nevertheless, the comment was irrelevant to defendant's guilt and, for that reason, should not have been made. However, as in both *Mendoza* and *Stansbury*, any impropriety was not prejudicial. The comment was brief and made during a long and otherwise unobjectionable jury argument. (See *People v. Stansbury*, *supra*, 4 Cal.4th at p. 1057.) When admonished by

the court, the prosecutor "did not return to the point." (*People v. Mendoza, supra*, 42 Cal.4th at p. 704.) We find no reasonable probability the jury would have reached a different verdict absent the comment. (*Stansbury*, at p. 1057.)

Defendant also argues that "the prosecutor improperly argued matters outside the record and became an unsworn witness." He did not object "on this basis, and therefore has forfeited this claim." (*People v. Redd, supra*, 48 Cal.4th at p. 743.) The contention also lacks merit. The comment was clearly based on the evidence presented at trial. As the evidence strongly supported the comment, no reason existed for the jury to believe otherwise.

## B. Issue Regarding Penalty

Defendant contends the court erred in admitting evidence in aggravation under Penal Code section 190.3, factor (b), that defendant committed a crime involving force or violence against his stepdaughter, Tammy Lucio (Tammy). He contends the evidence was insufficient to permit the jury to find he committed such a crime.

At a hearing outside the jury's presence, defense counsel requested an offer of proof regarding any crime committed against Tammy. The prosecutor responded that Tammy "had stated that [defendant] has hit her on the head previously." When defense counsel said, "Tapped her on the head," the prosecutor reiterated that Tammy had said defendant hit her on the head, although "she minimized it later on after saying that." Defense counsel stated her belief that Tammy would not corroborate anything about assaultive conduct. The court responded, "Then the District Attorney loses and anytime a party puts on evidence and it falls way short of what you contend

it is, it doesn't really help their position." The court ruled it was for the jury to determine whether it was just a tap in the head or a battery.

Thereafter, Tammy testified. She generally said defendant never assaulted her. She said he merely gave her a "gentle tap on the top of my head." She added that it was "never a striking blow. He's never hit me in my life." Additionally, she testified that defendant "treated me very good. He's always treated me with respect and he's showed me how to be a lady." She said that she responded, "hm-hmm" when an investigator asked her if it was more than "a striking blow," but she was not trying to tell the investigator that defendant hit her hard.

After the presentation of evidence, defendant asked the court to rule that the evidence was insufficient to support a finding of assaultive conduct. The court denied the request. It instructed the jury that the evidence of other crimes it could consider included "striking Tammy Lucio in the head, a violation of Penal Code section 242, a battery," and it defined the crime of battery. It also instructed that a juror could not consider the crime unless that juror first found defendant committed it beyond a reasonable doubt.

Defendant argues Tammy's testimony presented insufficient evidence for a juror to conclude beyond a reasonable doubt that defendant committed a criminal battery against her. "Because the question concerns the admissibility of evidence, it also comes within the trial court's discretion." (*People v. Rodriguez, supra,* 58 Cal.4th at p. 636.) Tammy's trial description of what defendant had done did not support a finding that he committed a battery. But her earlier apparent affirmative response to the investigator's question whether

defendant had hit her more than a striking blow, which was admissible for its truth as a prior inconsistent statement (Evid. Code, § 1235), did support such a finding, albeit just barely. Victims of domestic violence sometimes try to minimize the events later. The jury could reasonably believe this was one such occasion and give more credence to Tammy's earlier statement than to her trial testimony. This evidence of a crime was tenuous, but we believe admitting it and letting the jury decide came within the trial court's discretion.

Moreover, we would find any error harmless. As the trial court noted, when the evidence falls short of what the party presenting it expects, it is not good for that party. Tammy's testimony was generally favorable to defendant. If, as defendant contends, her testimony did not warrant a finding that he committed a crime against her, it is unlikely the jury would have given it much, if any, consideration in aggravation. It is far more likely that her testimony helped defendant, especially given that she was called as a prosecution witness. We find no reasonable possibility the verdict would have been different had the court not permitted the jury to consider Tammy's testimony as possible aggravating evidence. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960-961.)

### C. Cumulative Effect of the Asserted Errors

Defendant contends the cumulative effect of the asserted errors was prejudicial. We disagree. Any errors were minimal and had no cumulative effect.

### D. Challenges to California's Death Penalty Law

Defendant reiterates numerous challenges to California's death penalty law that we have repeatedly rejected. We adhere to our previous decisions.

Penal Code sections 190.2 and 190.3 are not impermissibly broad, and Penal Code section 190.3, factor (a), does not make imposition of the death penalty arbitrary and capricious. (*People v. Johnson* (2015) 60 Cal.4th 966, 997.) "Except for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required." (*Ibid.*) "CALJIC No. 8.88's use of the words 'so substantial,' its use of the word 'warrants' instead of 'appropriate,' its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a 'presumption of life' does not render the instruction invalid." (*People v. Rountree* (2013) 56 Cal.4th 823, 862-863.) Penal Code "[s]ection 190.3's use of adjectives such as 'extreme' and 'substantial' in describing mitigating circumstances does not impermissibly limit the jury's consideration of mitigating factors." (*Id.* at p. 863.) "The court need not delete inapplicable sentencing factors . . . ." (*Ibid.*) "Intercase proportionality review is not required." (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1180.) "The California death penalty scheme does not violate equal protection by treating capital and noncapital defendants differently." (*Ibid.*) "Use of the death penalty does not violate international law and is not unconstitutional." (*Ibid.*)

"Defendant also argues that the recent high court decision of *Hurst v. Florida* (2016) 577 U.S. __ [193 L.Ed.2d 504, 136 S.Ct. 616], which invalidated Florida's sentencing scheme, also invalidates California's. It does not. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235 & fn. 16.) 'The California sentencing scheme

is materially different from that in Florida.' (*Id.* at p. 1235, fn. 16.)" (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1038.)

### III. CONCLUSION

We affirm the judgment.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Sanchez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S087569
**Date Filed:** April 29, 2019

_____

**Court:** Superior
**County:** Tulare
**Judge:** Gerald F. Sevier

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Nina Wilder, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Kenneth N. Sokoler, Rebecca Whitfield and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nina Wilder
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Angelo S. Edralin
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 445-9555