Filed 3/28/23  P. v. Alderete CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ADRIAN ALDERETE,<br><br>　　　Defendant and Appellant. | H049331<br>(Monterey County<br>Super. Ct. No. 21CR002200) |

　　　A jury convicted appellant Adrian Alderete of (1) misdemeanor vandalism as to a wooden fence (Pen. Code, § 594)[1]; (2) felony vandalism causing damage in excess of $400 as to a car (§ 594, subdivision (b)(1)); (3) misdemeanor driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)); and (4) misdemeanor driving while having a blood alcohol content (BAC) of .08 or above (Veh. Code, § 23152, subd. (b)), with a finding that Alderete's BAC was .15 or more (Veh. Code, § 23578).  On appeal, Alderete challenges only the misdemeanor vandalism conviction, which he contends rests on an inadmissible witness identification secured through an unreliable in-field showup.  We affirm.

---

[1] Undesignated statutory references are to the Penal Code.

# I.    BACKGROUND

**A.    *Facts***

On March 22, 2019, Chrystal Mayer arrived at her residence, near the Sea Breeze Apartments on Lake Drive in Marina, to find that her usual parking spot was occupied by a parked car with a man inside, later identified as Alderete. Alderete got out, walked across the street to an unoccupied silver Toyota Corolla, and struck the Corolla repeatedly with his fist, possibly holding an object. He then walked into the Sea Breeze apartment complex. He emerged about five to 10 minutes later and drove his car into the Sea Breeze parking lot.

About 5:30 p.m. on March 22, 2019, Michael Macias was sleeping in his second-floor apartment in the Sea Breeze complex but awoke to the sound of what he believed to be woodworking. He went to his rear bedroom window and "poked [his] head outside." It was still daylight and Macias's line of sight was unobstructed. Around 20-25 meters away at the perimeter of the Sea Breeze property, a man was hitting and pulling on a wooden fence with his bare hands, removing some of the latticework and throwing it into a neighboring property. Macias decided that he was not observing authorized work, so he left his vantage point to contact the property manager by phone, then resumed his vigil from his balcony. About five to 10 minutes after he woke up, Macias saw two women speak to the man. All three left together in the direction of Lake Drive, but Macias lost sight of them before they reached the street.

Several patrol officers responded to the scene. Macias spoke to an officer and provided a description of the man he saw damaging the fence and the two women he saw walk away with the man.

During the interview, a car drove through the Sea Breeze parking lot past Macias. Macias told the officer that the driver was the man who had been damaging the fence. In response, the officer pursued the car on foot and flagged it down.

2

Alderete was the man driving the car, which law enforcement stopped in response to Macias's identification. Nobody else was in the vehicle. Alderete had a small scratch under his left eye and "what looked like a wrapped[-]up wound [on] one of his fingers." Several tissues or napkins in the car's center console appeared to have fresh blood on them.

The interviewing officer asked Macias to look at Alderete to see if he really was the man who damaged the fence. Macias asked whether the man was wearing a "blue hoodie or jacket." The officer said "Umm, I think so yeah. He's got his fingers are all cut up too." Before reaching Alderete, the officer stopped to read Macias an admonishment from a flash card. While the officer was locating the correct card, Macias attempted some small talk about his own prior experiences as a law enforcement officer. After reading the admonishment, the officer took Macias to look at Alderete. Alderete was sitting in the driver's side of his car with the passenger's side pulled up to the curb and the passenger-side window open. As they approached the car from the driveway, Macias said, "That looks like him." Upon arriving at the curb, Macias, looking through the open window, promptly told the officer again, that "looks like him." After the officer asked, "That *looks* like him?" Macias leaned forward towards Alderete and said, "Yeah."

Mayer saw Alderete being stopped by law enforcement when he drove out of the Sea Breeze parking lot and recognized him and his car from her earlier observations. She informed law enforcement that Alderete had hit the Corolla. Law enforcement inspected the Corolla and found several dents on the roof.

Seeing Mayer, Macias told law enforcement that she looked like one of the two women he had seen Alderete with when he walked away from the fence. Mayer denied knowing Alderete, but told officers she had seen another man, other than Alderete, leave the Sea Breeze parking lot on foot with two women.

While law enforcement was detaining Alderete, they became suspicious that he was under the influence of alcohol. Breathalyzer tests, about 6:23 pm. and 6:26 p.m.,

3

showed his BAC to be .16 percent. Blood drawn a few hours later showed a BAC of .072. In the booking process, officers took pictures of the front and back of Alderete's hands. One finger was bandaged, but no other injuries are apparent.

**B.**     *Procedural History*

In the Information, the Monterey County District Attorney charged Alderete with four counts: (1) felony vandalism over $400 for the damage to the wooden fence; (2) felony vandalism over $400 for the damage to the Corolla; (3) misdemeanor driving under the influence of alcohol; and (4) misdemeanor driving with a BAC of .08 or more. The District Attorney alleged an enhancement for driving with a BAC of .15 or more. After resting its case, however, the District Attorney alerted the trial court that it would be proceeding on only a misdemeanor vandalism theory as to Count 1.

Alderete's trial counsel moved in limine to exclude Macias's identification of Alderete as the man who damaged the fence and to preclude Macias from identifying Alderete in court. For the purposes of the in limine motion, the defense stipulated to the truth of the facts set forth in its briefing and to certain facts set forth in the District Attorney's opposition. The defense also secured admission of about four minutes of bodycam video, which depict Macias's in-field identification of Alderete. The trial court denied the motion, reasoning in part that Macias's identification of Alderete was reliable, given the totality of the circumstances. During trial, the prosecutor elicited testimony regarding Macias's in-field identification and secured Macias's courtroom identification of Alderete without a further defense objection.

In her closing argument, Alderete's trial counsel conceded that Alderete was "guilty of the DUI[,]" but argued that there was insufficient evidence to implicate Alderete in either vandalism count. Trial counsel argued that the person who vandalized the fence might have been the other man Mayer said she had seen leaving the Sea Breeze complex on foot with two women.

4

The jury found Alderete guilty of all counts, as modified by the prosecution, and found the enhancement true. The trial court placed Alderete on formal probation and ordered Alderete to pay $508 in restitution to Sea Breeze Property for damage to the fence. Alderete timely appealed.

## II. DISCUSSION

We conclude that the in-field showup in this case was conducted after law enforcement responded to Macias in a way that suggested the identification of Alderete. In light of this, we examine the totality of the circumstances to assess whether the identification itself was nevertheless reliable, mindful that " ' "a very substantial likelihood of irreparable misidentification" ' " is necessary to find a due process violation. (*People v. Sanchez* (2019) 7 Cal.5th 14, 35 (*Sanchez*).) While the record in this case contains evidence cutting in both directions, we conclude that factors confirming the accuracy of the identification are weightiest. (See *id*. at pp. 36-37.) Despite the suggestive nature of the in-field showup, we find Macias's identification of Alderete "sufficiently reliable to be admissible." (See *id*. at p. 37.)

### A. *Standard of Review*

" 'A due process violation occurs only if the identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." ' " (*Sanchez, supra*, 7 Cal.5th at p. 35; see also *People v. Wilson* (2021) 11 Cal.5th 259, 283 (*Wilson*).) "In determining whether a defendant's right to due process is violated by the admission of identification evidence, we consider ' "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so (2) whether the identification itself was nevertheless reliable under the totality of the circumstances." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 556 (*Clark*).) "In assessing the totality of the circumstances, [courts have] consider[ed] ' "such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description

of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." [Citations.] "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." ' " (*Wilson*, *supra*, 11 Cal.5th at p. 283, quoting *Sanchez, supra*, 7 Cal.5th at pp. 35-36.)[2]

"A claim that an identification procedure was unduly suggestive raises a mixed question of law and fact to which we apply a standard of independent review, although we review the determination of historical facts under a deferential standard." (*Clark*, *supra*, 63 Cal.4th at pp. 556-557.)

## B.     *The Trial Court's Factual Findings*

The trial court made several express factual findings based on its in limine review of the stipulated facts and the bodycam video. First, the trial court found that Macias had a good opportunity to view the individual at the fence. The trial court reasoned that Macias was able to give law enforcement a "relatively detailed description" of the individual before Alderete drove past, describing "the male as approximately 25 to 30 years old, Hispanic or white, 150 to 160 pounds, a goatee, indicating that he had a clear view of the suspect's face, and wearing a blue sweater with blue jeans and black shoes, which is a detailed description of the clothing."[3]  Second, on the basis of the same

---

[2] We note that more recent authority has identified "near unanimity in empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (See *People v. Lemcke* (2021) 11 Cal.5th 644, 665.) Nevertheless, a "large body of research" has "identified numerous factors that can affect the correlation between witness certainty and accuracy." (*Id*. at p. 667.) CALCRIM No. 315 includes as a factor relevant to the reliability of eyewitness identification, "How certain was the witness when he or she made the identification?" But as amended post-*Lemcke*, the pattern instruction proceeds to explain that "[a] witness's expression of certainty about an identification, whether the identification was made before or at the trial, may not be a reliable indicator of accuracy" before listing, without limitation, six factors that may impact the reliability of the witness's certainty as an indicator of accuracy.

[3] The trial court's account of Macias's description of the individual who damaged the fence is taken, nearly verbatim, from the statement of facts Alderete supplied in

description, the trial court found that Macias paid "quite a bit of attention" to the individual at the fence. Third, the trial court found that Macias exhibited a high level of certainty in his identification when, immediately after Alderete drove past, he told law enforcement that Alderete "looks exactly like" the man who damaged the fence. The trial court noted that Macias exhibited that high level of certainty before asking about Alderete's hoodie or being told about Alderete's injuries. Fourth, the trial court found that only ten to thirty minutes passed from the incident at the fence to the identification.

## C.    *Analysis*

The in-field showup in this case included the officer's unnecessary response to Macias's question about Alderete's clothing and unprompted disclosure of information about Alderete's apparent finger injuries—which were potentially consistent with Alderete having damaged a wooden fence using his bare hands as described by Macias. These statements, to a witness apparently seeking reassurance that he had correctly identified the person who committed the crime as the person drove by, suggested that the initial identification was correct. Moreover, these communications blunted the efficacy of the admonition, read from a flash card by the same officer. Although the admonition contained language directing Macias "not to be influenced by comments or information you have gained from other sources" and not to "feel obligated to identify anyone," the same officer had relied on Macias's prior identification of Alderete to stop his vehicle and had volunteered information suggesting that Macias's identification was correct.

However, we reject Alderete's suggestion that any in-field showup would have been unduly suggestive and unnecessary here. Law enforcement detained Alderete on the strength of Macias's spontaneous identification while Alderete drove past. (Cf. *In re Hill* (1969) 71 Cal.2d 997, 1005 [taking victim of violent robbery to identify assailants in

---

support of his motion in limine and stipulated to at the hearing on the motion. Alderete does not contend that it was error for the trial court to rely on these facts in ruling on his in limine motion.

a courthouse holding cell that contained only his suspected assailants two and one-half weeks after the fact was unduly suggestive and unnecessary].) Under these circumstances, an in-field showup could have served to test Macias's identification and, potentially, to exclude Alderete as a suspect. (See *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1359.)

Further, assuming that the officer's statements rendered the identification procedure in this case unduly suggestive, given the trial court's factual findings, we find no error in its determination that the identification was reliable under the totality of the circumstances. (See, generally, *People v. Cunningham* (2001) 25 Cal.4th 926, 989 [setting forth the two-pronged inquiry]; *Sanchez*, *supra*, 7 Cal.5th at p. 36.)

First, the trial court's factual determination that Macias had a good opportunity to observe Alderete, and paid quite a bit of attention to him, during the commission of the offense is supported by Macias's unequivocal and unsolicited identification of Alderete on seeing him drive past. The record, which includes the bodycam video admitted for the purposes of the motion in limine and contemporaneous photographs taken by law enforcement and admitted at trial, reflects that Alderete: (1) was wearing a hoodie, blue jeans, and black shoes—consistent with Macias's description of his clothing; (2) had light skin and dark hair—generally consistent with Macias's description of his ethnicity as Hispanic or White; (3) had a goatee—as Macias described; and (4) was 32 years old—close to the age range of 25 to 30 that Macias estimated. Moreover, Macias's estimate that Alderete weighed 150 to 160 pounds at the relevant time was very close to the estimate of 155 to 170 pounds offered by a police officer at trial.

Alderete argues that Macias's initial description was inaccurate because Alderete's hoodie was gray, whereas Macias described it as blue. The photographic evidence in the record does not support Alderete's treatment of this discrepancy as material. As shown outdoors, the color is sufficiently indistinct that the trial court could legitimately have concluded that Macias would have perceived it as blue from his second-floor apartment.

8

Although Macias identified the hoodie as blue rather than gray, his initial description closely tracked Alderete's actual appearance at the time in question and supported the trial court's finding that Macias had a good opportunity to observe Alderete and paid close attention to him.

Alderete also contends that Macias's description lacked detail. But, treating Macias's description of Alderete as "Hispanic or white" as an implied but vague indicator of Alderete's skin and hair color, Macias described Alderete's clothing, size, age, skin color, hair color, and facial hair with a reasonable level of accuracy. As the trial court found, Macias supplied a "relatively detailed description."

Alderete argues that because Macias watched the vandalism of the fence for a limited time from a window and a second-floor balcony about 80 feet away, Macias would not have had a good opportunity to view the individual responsible. Alderete further asserts that Macias did not pay close attention because he temporarily left his vantage point to call the property management. But, as the trial court found, Macias's description of the individual, including an accurate description of his facial hair, before seeing Alderete drive by, indicated that Macias had carefully observed the individual at the fence and had an opportunity to see his face.

Second, the record supports the trial court's conclusion that Macias identified Alderete with a high level of certainty. After the police stopped the car and before the police provided any additional details to Macias, Macias remarked that the driver "turn[ed] around and . . . look[ed] exactly like" the man who vandalized the fence. It was reasonable for the trial court to infer that Macias identified Alderete with a high level of certainty.

There is evidence in the record that could support a determination that Macias's level of certainty was lower. Immediately after making the comment on which the trial court relied, Macias, apparently seeking confirmation, asked whether the driver had "a blue hoodie or jacket." Moreover, when identifying Alderete at the in-field showup,

9

Macias said only that it "looks like" him, although he did so without hesitation. But even if we were to treat Macias's confidence level as somewhat lower than what the trial court determined, it would not change our conclusion as to the reliability of Macias's identification in the totality of the circumstances. Cognizant of the concerns raised in *Lemcke*, we are cautious not to place too much weight on Macias's outward manifestations of certainty, although we consider the inquiry relevant.[4]

Third, Alderete contends that requiring him to sit in the driver's seat of the car for the in-field showup primed Macias to recognize him not based on observing him at the fence but based on observing him drive past. We generally agree with the proposition that Macias may have been, to some degree, predisposed to confirm that Alderete was the person he saw damaging the fence based on his own spontaneous and unsolicited identification of Alderete as Alderete drove past, and by law enforcement's reliance on that identification. We consider this concern in weighing the totality of the circumstances.

Fourth, Alderete concedes that there was "not a very significant lapse of time" from the time Macias observed the vandalism to Macias's identification of Alderete. The short time lapse supports the reliability of Macias's identification.

Considering the totality of these circumstances, we conclude that Macias's identification of Alderete was sufficiently reliable to overcome the taint of the suggestive in-field showup. (See, generally, *Wilson*, *supra*, 11 Cal.5th at p. 283 [identifying factors

---

[4] Macias was contemporaneously quick to say that Mayer, who was farther away from him at the time, looked like one of the women he had seen walking away from the fence with the man. Alderete argues that this was a confident misidentification, which casts doubt on the reliability of Macias's confident identification of Alderete. The issue is not whether Macias has been confidently wrong in other identifications, but whether his identification of Alderete was reliable under the totality of its circumstances. We consider Macias's relative confidence level when he identified Mayer, with less indicia of reliability present, as one data point in our holistic consideration of the circumstances surrounding Macias's identification of Alderete.

to consider in assessing the totality of the circumstances].)  Accordingly, the trial court did not err by allowing evidence of Macias's in-field identification to be admitted at trial.[5]

## III.    DISPOSITION

The judgment is affirmed.

---

[5] Having so concluded, we need not reach Alderete's contentions that defects in the in-field identification precluded Macias from making an in-court identification or that the trial court's alleged errors were prejudicial.

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Alderete*
H049331