Filed 9/20/23  P. v. Reyes CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS QUEZADA REYES,<br><br>    Defendant and Appellant. | D080168<br><br><br>(Super. Ct. No. SCN424634) |

APPEAL from a judgment of the Superior Court of San Diego County, David L. Berry, Judge.  Affirmed with instructions to correct the judgment.

Janice R. Mazur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Jesus Quezada Reyes of driving a stolen vehicle and receiving, concealing, or withholding a stolen vehicle.  At trial, the prosecutor asked two witnesses to identify the driver of the stolen vehicle

in a video of Reyes' arrest, which occurred hours after the vehicle had been abandoned.

That identification procedure was unduly suggestive. Unlike a video of an event that the witnesses already saw firsthand or a photo array featuring Reyes and other men of similar build and features, the arrest video suggested to the witnesses that the police suspected that Reyes committed the crime. Worse still, the police previously told one witness that they caught the perpetrator, further influencing the procedure. Using the arrest video was also unnecessary given the absence of exigent circumstances.

Nevertheless, the two identifications were reliable under the totality of the circumstances. And even if unreliable, the erroneous identifications were harmless beyond a reasonable doubt because other record evidence tied Reyes to the crime.

We therefore affirm the judgment but order the trial court to correct the abstract of judgment.

## I.

On May 12, 2021, someone stole Fadi A.'s father's black Lexus. That evening, Fadi, a security guard, stepped out of his father's Lexus to patrol the area, and left the keys inside the car. When Fadi returned, the Lexus was gone.

After reporting the stolen vehicle, Fadi tried to find it, encountering the Lexus twice before recovering it. Fadi first saw the Lexus within a half-hour of the theft while riding in another car. At one point, the Lexus passed the car Fadi was riding in, and Fadi briefly saw the driver's face through the front windshield. Fadi described the driver as "[d]efinitely" male and wearing a baseball hat, light green jacket, and a black, gator-style mask that sits "on your neck and you just pull it up." The driver then sped away.

2

Not long after the Lexus sped away, it rearended Justin J. Following the collision, the two cars pulled over. The person driving the Lexus got out to speak with Justin. Justin described the driver, who he saw at night, as a Hispanic male with dark hair "a couple of inches long." The driver wore a black mask and dark jacket, but no hat. The driver immediately told Justin, "[T]his is not my car. This is not my car." The driver claimed to be "Joseph Martinez" and gave Justin an insurance card belonging to Fadi's father. The encounter "didn't settle right" with Justin because the Lexus driver seemed "in a rush," "very nervous," and "agitated."

A couple of hours later, Fadi spotted the Lexus again. Two or three people rode in the vehicle. Fadi saw the same "[d]ark brown" man driving the Lexus. He could not tell what the driver's hair looked like because he wore a hat. Rolling down the window of his friend's car, Fadi yelled at the Lexus driver to pull over.

Minutes after, Fadi saw the Lexus pull into a nearby motel. Fadi's friend parked his car across the street about 60 feet away. From there, Fadi watched the driver park the Lexus and get out. The driver, still wearing a mask, pulled a knife out of the Lexus and looked directly at Fadi. Fadi described the knife as roughly two feet long with a handle and a "cover or, like, some kind of case."

Fadi recovered the Lexus that evening. The Lexus, still at the motel, was locked, so Fadi had to get a spare key from home to do so.

Police officers arrested Reyes early the next morning when responding to a report of a suspicious man with a large knife. They found Reyes with a large knife covered by a sheath. While he carried the knife legally, Reyes matched the description of the driver of the stolen Lexus. Reyes had dark hair a couple of inches long and wore a gator-style mask. He also wore

gloves, which neither Fadi nor Justin recalled seeing on the driver. When the officers detained Reyes to investigate, they found the keys to the Lexus in his pocket.

A few days after Reyes' arrest, Fadi got a message from the police that stated they "caught him"—the person who drove the stolen Lexus—and asked Fadi to collect the Lexus keys found on Reyes.

The People charged Reyes with two counts: (1) unlawful driving of a vehicle (Veh. Code, § 10851, subd. (a)); and (2) withholding, receiving, or concealing a stolen vehicle (Pen. Code, § 496, subd. (d)).

At trial, over defense objection, the prosecutor for the first time showed Fadi and Justin a video of Reyes' arrest. After showing them the video, the prosecutor asked each witness if the arrestee, Reyes, was the same person they encountered in the stolen Lexus. Both Fadi and Justin said yes. Fadi felt 100 and even "200 percent sure" of his identification. Justin felt 95 percent certain. Fadi also viewed a photo of the knife that Reyes possessed when arrested and confirmed that he had seen that same knife on the Lexus driver.

The jury convicted Reyes on both counts.

II.

On appeal, Reyes asserts that showing Fadi and Justin the arrest video to identify him violated his due process rights under the United States and California Constitutions.

When evaluating if identification evidence violates due process, we consider "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*).) If the identification violated due

4

process, then we must reverse the conviction unless the error was harmless beyond a reasonable doubt. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 675, quoting *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Although we defer to the trial court's factual findings, we independently review whether an identification procedure was unduly suggestive. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 768 (*Holmes, McClain and Newborn*).)

## A.

We conclude that asking Fadi and Justin to identify the stolen Lexus driver in Reyes' arrest video was both unduly suggestive and unnecessary.

## 1.

An unfair procedure suggests in advance the identity of the person the police suspect. (*Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at p. 768.)

Here, the prosecutor showed the witnesses a video of Reyes' arrest. Showing only Reyes in the video made the identification procedure suggestive. (See *People v. Sanchez* (2019) 7 Cal.5th 14, 36 (*Sanchez*) ["[A] single-photograph showup is inherently suggestive, at least to some extent."].) And the procedure was unduly suggestive because the video presented Reyes being arrested. Viewing Reyes' arrest suggested to Fadi and Justin that the police suspected Reyes was the culprit. Exacerbating the situation for Fadi, the police previously told him that they caught the perpetrator. Thus, Fadi knew before viewing the arrest video that it showed who the police believed drove the stolen Lexus.[1]

---

[1]    That risk of improper influence is why, in a memorandum attached to Reyes' motion in limine, the Department of Justice recommends against telling a witness that " '[w]e found the guy' " or " '[w]e arrested someone' " before showing a photo array for identification.

While the People argue that a video of an arrest is no different than a video of the crime itself, we disagree. The People cite *People v. Ingle* (1986) 178 Cal.App.3d 505 in support. There, a robbery victim watched surveillance video of the crime before identifying the defendant in a photo lineup. (*Id.* at pp. 508-509.) The court found nothing unnecessarily suggestive about the procedure in part because the victim personally observed the robbery before watching the video of the same event. (*Id.* at pp. 513-514.)

When dealing with a victim-witness, as we are here, a key difference distinguishes a crime video from an arrest video: firsthand knowledge. A victim-witness has already seen the event depicted in the crime video. Thus, the video would not suggest anything new, but rather permit the witness to, among other things, refresh his or her recollection. In contrast, the new information in an arrest video—that police chose to arrest a particular suspect—suggests more to the witness about who the police believe was responsible. We therefore conclude the procedure utilized to identify Reyes was unduly suggestive.

2.

It was also unnecessary to identify Reyes using his arrest video. Exigent circumstances may sometimes justify an unduly suggestive identification procedure. In *Stovall v. Denno*, for example, it was "imperative" that the police bring the suspect to the hospital for a one-person identification because the lone witness to the crime suffered severe injuries and "[n]o one knew how long [she] might live." (*Stovall v. Denno* (1967) 388 U.S. 293, 302.) Consequently, "the police followed the only feasible procedure" to identify the suspect. (*Ibid.*)

This case falls far short of the situation in *Stovall v. Denno*. Indeed, no emergency required showing the witnesses Reyes' arrest video for

6

identification. The People had ample time and opportunity to identify Reyes
another way. For example, the record contains no details that prevented the
People from showing each witness, either before or during trial, a photo array
including Reyes' booking photo and those of five other men of the same build
and features. Indeed, using Reyes' booking photo would offset the People's
one claim of necessity—that Reyes cut his hair and grew a mustache between
his arrest and trial—because it showed how Reyes appeared on the day of his
arrest. Regardless, Reyes' change in appearance is irrelevant because
neither Fadi nor Justin was asked to identify the defendant sitting in court;
they were asked only if the man in the arrest video matched who they saw
driving the stolen Lexus.

While other situations or types of videos might not rise to the level of
unduly suggestive, the facts here show why "[i]t is generally better to use a
multiple-photograph lineup." (*Sanchez*, *supra*, 7 Cal.5th at p. 37.)

B.

Because the procedure was both unduly suggestive and unnecessary,
we must assess the reliability of the identifications. We examine reliability
based on the totality of the circumstances, including factors such as:

- the opportunity of the witnesses to view the suspect at the time of the
  offense,
- the witnesses' degree of attention at the time of the offense,
- the accuracy of the witnesses' prior description of the suspect,
- the level of certainty shown at the time of the identification, and
- the lapse of time between the offense and the identification.

(*Cunningham*, *supra*, 25 Cal.4th at p. 989.) We weigh these factors against
the "corrupting effect" of the suggestive identification. (*Sanchez*, *supra*,
7 Cal.5th at p. 36.)

7

We conclude that Fadi's and Justin's identifications were reliable despite the unduly suggestive and unnecessary procedure.

Both witnesses had the opportunity to see the Lexus driver and presumably paid close attention when they did. Fadi saw the masked driver at night from another car, in passing and then from 60 feet away, but was specifically looking at the driver of the stolen Lexus. Justin spent time speaking directly with the masked driver after being rearended. Though dark out, Justin likely "paid attention to the suspect[ ] because of [his] odd behavior." (*Holmes, McClain and Newborn*, *supra*, 12 Cal.5th at p. 770.)

While not perfect and despite the lapse of four and one-half months between the incident and trial, Fadi's and Justin's descriptions matched Reyes. Fadi described a "[d]ark brown" man wearing a gator-style mask and carrying a long, covered knife. Justin spoke with a Hispanic man with dark hair a couple of inches long who wore a mask. Those descriptions are consistent with Reyes' appearance at the time of his arrest: a Hispanic man with dark hair a couple of inches long who wore a gator-style mask and carried a long knife in a sheath. These similarities outweigh slight differences in how the witnesses described Reyes' clothing, such as the presence or absence of a hat or gloves and the color of his jacket.

Both witnesses expressed strong certainty that Reyes was the same man they saw driving the stolen Lexus. Even so, we give this factor less weight because empirical research largely agrees that " ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (*People v. Lemcke* (2021) 11 Cal.5th 644, 665.)

Though a closer call for Justin because his description did not include a distinctively long knife, under the totality of the circumstances, both his and Fadi's identifications were reliable.

## C.

Finally, we disagree with Reyes' due process challenge because we conclude that even if the trial court erred in admitting Fadi's and Justin's identifications, the error was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

Reyes contends that no other evidence places him as the *driver* of the stolen Lexus, as opposed to a mere passenger. But even without Fadi's or Justin's identification, other record evidence ties Reyes to the crime. Chiefly, Fadi left the keys in the Lexus when it was stolen and saw the driver get out of the car matching Reyes' characteristics; a few hours later, Reyes had the keys to the stolen Lexus in his pocket. In addition, the jury could match the witnesses' description of the driver, described *ante*, with Reyes' appearance in the arrest video. The People introduced and played the arrest video for the jury—without defense objection—during the testimony of one of the arresting officers and before either Fadi or Justin testified. Thus, by the time Fadi and Justin described the Lexus driver, the jury could compare those descriptions with the video they previously watched. Notably, at the time of his arrest, Reyes wore a gator-style mask and carried a large, sheathed knife like the one Fadi described seeing the Lexus driver hold. Thus, even without the witness identifications, the record evidence creates no reasonable doubt that Reyes was the same man that Fadi and Justin saw driving the stolen Lexus.

## III.

The People ask, without opposition, that we order the trial court to correct the abstract of judgment to reflect the trial court's oral judgment. An abstract summarizes the trial court's judgment. If the abstract and the oral judgment differ, the oral judgment controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, 188 (*Mitchell*).)

9

At sentencing, the trial court addressed Reyes' conviction in this matter and his probation revocation for two prior convictions. Two aspects of the abstract of judgment require correcting.

First, for the probation revocation in SCN418067, the trial court orally sentenced Reyes to 16 months to run concurrently with the other sentences imposed. As the People note, the abstract of judgment, however, lists one concurrent year. The abstract of judgment must be corrected to impose 16 months for SCN418067.

Second, for count 1 in SCN424634, the trial court imposed the "low term" of two years, which it doubled under Penal Code section 666.5, subdivision (a). The court specifically noted that it "[was] not imposing the upper term." Yet the abstract classifies this four-year total sentence as the upper term. Although no party raises this discrepancy, we direct the trial court to amend the abstract to list the lower-term classification for count 1, violation of Vehicle Code section 10851, subdivision (a). (*Mitchell*, *supra*, 26 Cal.4th at p. 185 ["It is, of course, important that courts correct errors and omissions in abstracts of judgment."].) The time imposed remains the same.

IV.

We direct the trial court to correct the abstract of judgment to reflect the orally imposed (1) 16-month concurrent sentence for SCN418067 and (2) lower-term classification for count 1 in SCN424634, and to forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, we affirm the judgment.


CASTILLO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.